IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 9, 2014 Session

## STATE OF TENNESSEE v. WILLIAM EUGENE HALL

**Automatic Appeal from the Court of Criminal Appeals**
**Circuit Court for Humphreys County**
**Nos. 10526, 10527, 10556, 10557, 10558, 10559      Jon Kerry Blackwood, Sr. Judge**

_____

**No. M2012-00336-SC-DDT-DD - Filed March 20, 2015**

_____

The defendant was convicted on two counts of felony murder in the perpetration of a first degree burglary, three counts of grand larceny, one count of petit larceny, and three counts of first degree burglary. The jury imposed a sentence of death for the murder of one victim and a life sentence for the murder of the second victim. The trial court ordered an aggregate sentence of eighty years for the remaining crimes, to be served consecutively to the life sentence. The direct appeal was decided adversely to the defendant. On post-conviction review, this Court granted the defendant a delayed appeal and remanded to the trial court based upon the lack of meaningful representation during the original direct appeal. The trial court denied relief, and the Court of Criminal Appeals affirmed. We affirm the judgment of the Court of Criminal Appeals.

### Tenn. Code Ann. § 39-13-206(a)(1) (2014); Judgment of the Court of Criminal Appeals Affirmed

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK and HOLLY KIRBY, JJ., joined. SHARON G. LEE, C.J., filed a concurring opinion. JEFFREY S. BIVINS, J., not participating.

Patrick T. McNally and Paul J. Bruno, Nashville, Tennessee, for the appellant, William Eugene Hall.

Robert E. Cooper, Jr., Attorney General and Reporter; Joseph F. Whalen, Acting Solicitor General; James E. Gaylord, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Robert Wilson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Summary of Procedural Status**

The current proceeding in this capital case is a delayed appeal on behalf of William Eugene Hall (the "Defendant"). At a joint trial that extended over a period of six weeks and two days in 1991 and 1992, the Defendant and his co-defendant, Derrick Quintero, were each convicted by a jury of two counts of first degree felony murder, three counts of grand larceny, one count of petit larceny, and three counts of first degree burglary. The Defendant and Quintero were sentenced to death for the murder of Myrtle Vester and to life imprisonment for the murder of Buford Vester. James Blanton, who was indicted in the same criminal episode, was tried separately and convicted of two counts of first degree premeditated murder, four counts of grand larceny, and three counts of first degree burglary. He was also sentenced to death, State v. Blanton, 975 S.W.2d 269 (Tenn. 1998), but died in prison in 1999.

On the direct appeal by the Defendant and Quintero, the Court of Criminal Appeals affirmed the murder convictions, the imposition of the death penalty, and all other sentences except that each of the petit larceny convictions was merged with one of the grand larceny convictions. State v. Hall, No. 01C01-9311-CC-00409, 1997 WL 92080 (Tenn. Crim. App. Mar. 20, 1997) (corrected opinion). This Court affirmed. State v. Hall, 976 S.W.2d 121 (Tenn. 1998). Afterward, the Defendant and Quintero filed separate petitions for post-conviction relief, each primarily alleging a violation of his right to the effective assistance of counsel. During a joint evidentiary hearing, each also filed petitions for writs of error coram nobis, alleging newly discovered evidence. The post-conviction court denied relief as to all claims, and the Court of Criminal Appeals affirmed. Quintero v. State, No. M2005-02959-CCA-R3-PD, 2008 WL 2649637 (Tenn. Crim. App. July 7, 2008). Thereafter, the Defendant and Quintero each filed in this Court an application for permission to appeal the denial of post-conviction relief.

This Court denied Quintero permission to appeal, thereby ending his participation in these proceedings, but we granted the Defendant relief in the form of a delayed appeal based upon the lack of meaningful representation in the original direct appeal. Specifically, we determined that by copying and pasting the appellate brief filed by Quintero, counsel for the Defendant had performed so deficiently that the Defendant was entitled to newly appointed counsel and an opportunity to amend his original motion for new trial. By "Corrected Order" dated October 30, 2009, this Court directed the Defendant to file a motion for new trial in the trial court and, in the event the convictions and sentences were upheld, to proceed with a delayed direct appeal. Meanwhile, we held in abeyance the appeal of the denial of post-conviction relief pending resolution of the issues in the delayed appeal. See Tenn. Sup. Ct. R. 28, § 9(D).

Upon remand to the Circuit Court for Humphreys County, the Defendant filed a motion for new trial in November of 2009 and an amended motion for new trial in January of 2011. These motions re-asserted the Defendant's original motion for new trial that had been filed in 1992, as well as his post-conviction claims and his petition for writ of error coram nobis. After an evidentiary hearing on the motions for new trial and accompanying petition for writ of error coram nobis, the Defendant was denied relief as to all claims in this delayed appeal. The Court of Criminal Appeals affirmed the judgment of the trial court. State v. Hall, No. M2012-00336-CCA-R3-DD, 2013 WL 5761311 (Tenn. Crim. App. Oct. 22, 2013). The case is now before this Court for automatic review pursuant to Tennessee Code Annotated section 39-13-206(a)(1) (2014).

## II. Facts
### A. Evidence at Trial

On June 16, 1988, the Defendant and seven other inmates escaped from the Kentucky State Penitentiary in Eddyville, Kentucky, which is located on the Cumberland River in the Southwest region of that state. While three of the escapees, Bobby Sherman, Leo Spurling, and Floyd Cook, were captured in the vicinity of the prison within two days of their escape, five others, identified as the Defendant, Quintero, Blanton, Joseph Montgomery, and Ronnie Hudson, were able to steal a pickup truck and drive across the state line into Stewart County, Tennessee, which borders Kentucky Lake. In the few days following the prison escape, there were reports of several burglaries in the Leatherwood area of Stewart County, a community largely made up of seasonal and retirement residences. On June 22, the bodies of Myrtle and Buford Vester were discovered inside their home. The Vesters were last seen alive during the late afternoon of June 19.

Shortly after the prison escape, Zachary Pallay, who lived within a quarter mile of the Vester residence, notified the Stewart County Sheriff's Department that Quintero was familiar with the Leatherwood community and might seek refuge there. Pallay, who had committed an armed robbery with Quintero several years earlier, had been friends with Quintero since childhood, when they had often played together in the lake resort area. In addition to Pallay, there were other reports to the Sheriff's Department of suspicious individuals in the area.

Not counting the Vester residence, there were six break-ins in or near the Leatherwood community in the days immediately following the Defendant's escape: the residences of Jim McMinn, Essie Settles, Alfred Cherry, Thomas Harris, Neal Foster, and John and Virginia Crawford.[1] The investigation by law enforcement established that most

---

[1] There were first degree burglary convictions for the Vester, Cherry, and Foster residences. There
(continued...)

of the burglaries took place before 1:00 p.m. on June 19. The McMinn burglary, apparently the first, occurred on June 18. McMinn returned from a fishing trip to find that his telephone had been removed from the wall, his telephone line had been cut, and the ignition to his truck had been destroyed. Several shotgun shells were lying on the floor and McMinn's .22 caliber pistol was missing from his bedroom.

Suspicious that the prison escapees were in the area, the Stewart County Sheriff's Department used helicopters, four-wheel-drive vehicles, and tracking dogs to conduct their search. Officers found and chased on foot some unidentified men they saw in the woods but were unable to overtake them.

At some point, Hudson and Montgomery became separated from the Defendant, Quintero, and Blanton. Hudson and Montgomery were able to steal a 1982 Ford Fairmont from Essie Settles, who lived some six miles away from the Leatherwood community. The two men then drove to Lebanon, Kentucky, which is located near Louisville, to meet with members of Hudson's family. Afterward, they hid Settles' vehicle. On June 22, four days after the McMinn burglary, Hudson and Montgomery were apprehended by Kentucky law enforcement officers after an exchange of gunfire. One of two .22 caliber pistols found in their possession belonged to McMinn. The other pistol was eventually determined to have been stolen from the residence of Neal Foster. Montgomery's fingerprints were found on the door of Settles' garage.

On June 19, the day after the McMinn burglary, Alfred Cherry discovered that his residence had also been burglarized. Several items were missing, including six knives and two paperweights bearing the Cumberland Electric logo. Two of the knives Cherry owned were found at the Foster residence, indicating that the Cherry burglary had occurred before the Foster burglary. Some seventeen months after the burglaries, the stolen pickup truck used in the escape from Kentucky was discovered hidden under tree branches in a remote area of Stewart County. Cumberland Electric paperweights identical to those missing from the Cherry residence were found inside.

Thomas Harris, who lived next door to Cherry, also learned on June 19 that his residence had been burglarized. The sink was full of dirty dishes, and wet towels and sheets were strewn about the residence. Quilts, silverware, knives, and other items were missing. Harris later discovered that three long-distance telephone calls had been placed from his

---

[1](...continued)
was a grand larceny charge for items taken from the Vester residence, which resulted in the conviction for petit larceny. There was a grand larceny conviction for the theft of the Vesters' vehicle. Grand larceny convictions also resulted from items stolen from the Cherry and Foster residences.

residence to Springtown, Texas during the early morning hours of June 19. Two other calls had been placed to Hopewell, Pennsylvania during that time. The Texas telephone number was registered in the name of Bryan Quintero, a brother to Derrick Quintero. The Pennsylvania number was registered in the name of Barbara Vasser, the Defendant's girlfriend at the time of the prison escape.

Neal Foster, who had been away from his residence since June 16, did not discover the burglary until he returned on June 21, some three days after the report of the McMinn burglary. A .30-30 rifle, ammunition for various weapons, a 20-gauge shotgun, and silver dollars, among many other items, were missing. A portion of the barrel of the shotgun had been sawed off and left at the residence. Quintero's thumbprint and fingerprint were later found on shotgun shell boxes, and his palm print was found on a gun barrel. Blanton's print appeared on a shotgun shell box. The Defendant's fingerprint was found on a soft drink can.

On June 23, John and Virginia Crawford, who had last been at their residence at 2:00 p.m. on June 19, learned that they had also been burglarized. Several items of food had been taken. The thumbprint of the Defendant was found on a can of ham inside the residence, and a fingerprint of Blanton was taken from a candy wrapper. A glove taken from the Crawford residence was a match for a glove found outside the front bedroom window of the Vester residence, which was located only one quarter mile away.

During the course of their investigation, officers learned that John Corlew and Arthur Jenkins, who had been fishing, had heard five gunshots on June 20, 1988, between 11:00 p.m. and midnight, all from the direction of the residence owned by the Vesters. Corlew concluded that the first two shots had been fired from a different weapon than the third and fourth shots. Jenkins believed that the first two shots were from a pistol.

Wayne Vester, the son of Myrtle and Buford Vester, had visited his parents over the weekend and, before leaving at 6:00 p.m. on June 19, had bought packages of Pepsi for them. After he was unable to reach them by telephone on June 21 and again on June 22, he called Howard Allor, a neighbor, and asked him to check on them. When Allor found the bodies, he contacted the authorities. Officers with the Sheriff's Department, working in conjunction with the Tennessee Bureau of Investigation, discovered that the 1985 Pontiac owned by the Vesters was missing and that their telephone line was dead. The officers determined that the perpetrators had gained access through a window of the back bedroom, where Mr. Vester slept, and that he had been shot at least once from the outside of the residence. A spent 20-gauge shotgun shell was found near Mr. Vester's bedroom window. A 20-gauge shot was found near his head and several pellets were recovered from his body. Mrs. Vester, who slept in a separate bedroom, had been shot three times by two different weapons—a 20-gauge shotgun and a high-powered rifle. She had also been stabbed thirteen times. A hole in the

screen over her bedroom window indicated that at least one shot had been fired from outside. Shot pellets and shards of glass were found throughout the interior of the residence. An edition of the Tennessean newspaper dated and scheduled for delivery on June 20 was found on a sofa. Although an unopened Pepsi was found outside the residence, the packages of Pepsi left by Wayne Vester were missing.

At approximately 8:00 a.m. on June 21, employees of the Memphis Funeral Home observed three men leave a 1985 Pontiac in the parking lot. They described all as white, bearded men weighing about 180 pounds, one of whom had long hair; however, the employees were otherwise unable to make positive identifications. Two days later, the funeral home employees contacted the police, who then confirmed that the Pontiac was owned by the Vesters. The Memphis Police Crime Scene Squad discovered a sawed off 20-gauge shotgun containing one live round inside the vehicle. The gun, which bore Foster's name, was later identified as that taken from the Foster residence. A shell found outside of the Vester residence was determined to have been fired from the same shotgun. The police also discovered a .30-30 caliber cartridge matching ammunition taken from the Foster residence. Three of Blanton's fingerprints appeared on a beer can inside the vehicle. The police recovered thirteen 20-gauge shotgun shells from the vehicle and also found a flashlight identical to one that had been taken from the Crawford residence. A twelve-pack of Pepsi colas and three individual twelve-ounce Pepsis were in the car.

Curtis Jones, a security guard at the Greyhound bus station in Memphis, recalled that between 11:00 a.m. and 1:00 p.m. on either June 21, the date the Vesters' Pontiac was left at the funeral home, or the following day, he saw three men, one of whom appeared to be Hispanic, enter the bus station to use the phone. When Jones approached them to ask whether they had tickets, a man Jones was later able to identify as Blanton explained that they intended to leave as soon as their "friend" finished his phone call. Jones identified the Defendant and Quintero from a photographic lineup. He also identified them at their joint trial.

Shirley Denise Morrow, a cashier at the Blue Movies West adult bookstore and entertainment establishment in Memphis, recalled that three men, one of whom appeared to be of Mexican descent, came into the store on the morning of June 21 and traded a few silver dollars for tokens. While there, the three men entered the booth of dancer Darlene Christof, who described two of the men as white and the other as Hispanic or Mexican. Later, Christof was able to identify Quintero from a photographic lineup. She recalled that Quintero gave her several silver dollars and attempted to sell her a class ring and a wedding band. Before leaving the establishment, one of the three men tried to sell Morrow the class ring and wedding band. However, when Christof commented in the presence of the three men that they resembled the escapees from the Kentucky prison and then pretended to use the

-6-

telephone, the men left, and Morrow contacted the police. Morrow was able to identify the Defendant, Blanton, and Quintero from a photographic lineup; she also identified them at trial. The six silver dollars that Morrow had purchased from the three men were later identified as those that had been stolen from the Foster residence.

Barbara Vasser, the Defendant's girlfriend at the time of the offenses, recalled several telephone conversations she had with the Defendant after his escape from the Kentucky prison. In the first call, the Defendant informed her that the authorities in Stewart County were using helicopters in their search. He also informed her that he and Quintero had become separated from Hudson and Montgomery. When the Defendant telephoned Vasser a third time, her mother notified the Pennsylvania State Police. Afterward, Vasser agreed that if the Defendant called again, she would set up a time and place to send him money. When the Defendant telephoned to ask that she wire money to the Western Union in El Paso, Texas, which is located just across the border from Juarez, Mexico, the Federal Bureau of Investigation ("FBI") became involved and captured the Defendant. Four days later, Mexican officials arrested Quintero and Blanton at the Santa Fe Hotel in Juarez and transported them into the custody of the FBI at a border check point. At the time of his arrest, Quintero had a wallet bearing an imprint of Foster's driver's license.

Neither the Defendant nor Quintero testified at trial, but their trial counsel challenged the accuracy of their identification by the employees at the funeral home, all of whom had described them with facial hair. A lieutenant from the Kentucky prison testified that Quintero had long hair, a moustache, sideburns, and a beard at the time of the escape, but that he had never seen the Defendant with a beard. A prison barber, Ben Spencer, testified that the Defendant was unable to grow a beard.

Wayne Vester and Howard Allor were also called as witnesses. Neither was aware of any friendship between the Vesters and Pallay, who had previously done work at the Cherry, Harris, and Crawford residences and was at one time a suspect in the crimes.

Dr. Charles Harlan, the medical examiner who performed the autopsies, confirmed that the Vesters had been shot a total of five times with three different weapons. Mrs. Vester had been shot three times, once with a shotgun and twice with either a shotgun or a high-velocity rifle, and had suffered thirteen stab wounds. Mr. Vester had been shot twice with a shotgun. In Dr. Harlan's opinion, the Vesters had died within two hours of their evening meal on June 20, 1988.

As indicated, the Defendant and Quintero were each convicted of two counts of murder during the perpetration of first degree burglary, three counts of grand larceny, one count of petit larceny, and three counts of first degree burglary. The trial court ordered an

effective eighty-year sentence for the burglary and larceny convictions. A subsequent hearing was scheduled for the jury to determine the sentences for the first degree murder convictions.

At the sentencing hearing on the murder convictions, both the Defendant and Quintero presented evidence of mitigating circumstances. Robert Hall, the Defendant's brother and a prison minister, testified that their mother had died when the Defendant was four and he had been sent to live with his father and stepmother. Hall described the Defendant as using drugs as a pre-teen and abusing drugs by his early twenties, and he believed the Defendant to be a follower rather than a leader. Barbara Vasser, the Defendant's former girlfriend, stated that she had assisted law enforcement only because she feared for the Defendant's safety.

Dr. Kenneth Anchor, a clinical psychologist, testified that the Defendant had been addicted to Valium by age fourteen, had been sent to a juvenile detention facility on several occasions, had spent time at a youth development center, and had been in and out of prison since the age of seventeen. With an I.Q. of ninety-nine, the Defendant placed in the forty-eighth percentile, but Dr. Anchor opined that the Defendant had difficulty using his intelligence because of a history of drug and alcohol abuse and two prior head injuries. He described the Defendant as seriously maladjusted, suffering from a treatable form of organic personality syndrome, but not presenting a danger to others in a prison environment and having a positive prognosis absent substance abuse. Dr. Samuel Craddock, a rebuttal witness for the State, disagreed with Dr. Anchor's diagnosis and further stated that the Defendant could be a potential source of danger.

The Defendant and Quintero were sentenced to life imprisonment for the murder of Buford Vester[2] and to death for the murder of Myrtle Vester. The jury found five aggravating circumstances that warranted the death penalty: (1) the defendants were previously convicted of one or more felonies involving the use of threat or violence, Tenn. Code Ann. § 39-2-203(i)(2) (1982); (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind, id. § 39-2-203(i)(5); (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendants or others, id. § 39-2-203(i)(6); (4) the murder was committed while the defendants were engaged in committing or were accomplices in the commission of, or were attempting to commit, or were fleeing after committing or attempting to commit, a burglary or larceny, id. § 39-2-203(i)(7); and (5) the murder was committed by the

---

[2] At the time of the trial, life imprisonment without the possibility of parole was not a sentencing option for first degree murder. See Tenn. Code Ann. § 39-13-204(a) (1991).

defendants while they were in lawful custody or in a place of lawful confinement, or during their escape from lawful custody or place of lawful confinement, id. § 39-2-203(i)(8).

## B. Original Direct Appeal

On direct appeal, the Court of Criminal Appeals merged the petit larceny convictions with those for one of the three grand larceny convictions, but otherwise affirmed the convictions and sentences, holding that the jury's erroneous reliance upon the aggravating circumstances set out in Tennessee Code Annotated section 39-2-203(i)(6) and (7) qualified as harmless beyond a reasonable doubt. Hall, 1997 WL 92080, at *51-52, *59. While ruling, contrary to the Court of Criminal Appeals, that it was not error for the jury to rely upon the aggravating circumstance in section 39-2-203(i)(6) (murder to prevent arrest), this Court ultimately affirmed the convictions and sentences. Hall, 976 S.W.2d at 133, 139.

During the trial and throughout the direct appeal, the Defendant was represented by N. Reese Bagwell of Clarksville and Jennifer Davis Roberts of Dickson. Quintero was represented by Shipp R. Weems, the District Public Defender, and an Assistant Public Defender, Steve Stack, of Charlotte. In May of 1999, the Defendant and Quintero each filed a pro se petition for post-conviction relief claiming ineffective assistance of counsel throughout the proceedings. Appointed counsel filed amended petitions. At the evidentiary hearing, the Defendant and Quintero also filed petitions for writs of error coram nobis based upon claims of newly discovered evidence, which were heard simultaneously with the petitions for post-conviction relief.

## C. Post-Conviction and Coram Nobis

Judge Robert E. Burch presided over the post-conviction proceedings at the trial court level. As indicated, the petitions for post-conviction relief primarily alleged that the Defendant and Quintero had been denied their rights to the effective assistance of counsel. At the lengthy evidentiary hearing before Judge Burch, the Defendant and Quintero also presented "newly discovered evidence" in support of their claims for writs of error coram nobis.

Ronnie Cauthern, an inmate on death row, testified that he had become acquainted with Blanton prior to his death in 1999. Cauthern claimed that Blanton had admitted to killing the Vesters and had stated that neither the Defendant nor Quintero was present at the time. According to Cauthern, it had been Blanton's intention to "step-up and stop" their executions if they materialized. He also claimed that Blanton, who had previously been convicted of a murder, actually bragged about killing the Vesters.

Terry Lynn King, also a death row inmate, testified similarly to Cauthern, alleging that Blanton "felt really bad" that the Defendant and Quintero had received the death penalty for

his crime. According to King, Blanton related that during the "sawed off shotgun" burglary they thought they saw a police officer, and that the Defendant and Quintero fled in one direction, Blanton fled with Montgomery and Hudson in a different direction, and Blanton later went to a location where they had planned to meet "Zach." According to King, Blanton claimed that "Zach" had already driven the Defendant and Quintero to Nashville to meet Quintero's father and that because "Zach" was reluctant to take Blanton there, he took Blanton instead to the residence of the Vesters, who had money and a car. It was King's understanding that only a man was murdered and that Blanton never made reference to a female victim. King recalled that Blanton said he murdered the male victim because he "put up a fight." King testified that Blanton, who made no mention of whether "Zach" had a role in the murder, also told him that he later met the Defendant and Quintero at a bus station in Memphis, as they had pre-planned in the event of their separation. King was unable to state whether Blanton had ever mentioned "Zach's" last name.

Celerino Quintero, the father of Derrick Quintero, testified by deposition. A resident of Springtown, Texas, he asserted that he had received two telephone calls from the Defendant during the period after his escape from the Kentucky prison. Mr. Quintero claimed that in the first call, the Defendant asked whether he had heard from his son in the last day or so, explaining that they had become separated; in the second call, the Defendant confirmed that he had located Derrick Quintero and asked Mr. Quintero to drive to "the old truck stop in Nashville." Mr. Quintero stated that he drove to Nashville, fell asleep upon his arrival, and was later awakened by his son, the Defendant, and Zach Pallay. At that point, his son informed him that they needed to leave in order to meet someone at a bus station in Memphis. According to Mr. Quintero, he then drove his son and the Defendant to Memphis, dropping them off about seven or eight blocks from the bus station. He claimed that he did not learn of the murders until he returned home to Texas. When asked why he did not testify at trial, Mr. Quintero explained that his son was adamant that he not get involved at that time.

Kathleen Bernhardt also testified at the evidentiary hearing. She stated that Quintero had approached her at her church after he had escaped from prison in 1983, accompanied by five other escapees. According to Bernhardt, her car keys were taken but Quintero treated her respectfully and prevented one of the other men from holding a rag over her mouth. This evidence, which had not been presented at the trial, was designed to establish that Quintero would not approve of the mistreatment of a burglary or robbery victim.

Quintero, who had been convicted of armed robbery in 1979 and two separate escape charges in 1983 and 1984, testified at the post-conviction hearing. He claimed that he had wanted to testify at the trial but that his attorneys never discussed his option to do so. He explained that his medication made him groggy and that, in consequence, he did not realize he had missed his opportunity to testify until it was too late. He complained that prior to

-10-

trial, his attorneys visited him only twice and contacted him by phone only ten times. Quintero expressed surprise that his counsel made no effort to contact his father during their preparations for trial and never asked about the possibility of an alibi.

According to Quintero, he was the only one of the prison escapees who had any money and, because Blanton and the Defendant did not get along, there were different "groups of people that escaped." Quintero acknowledged, however, that he, Blanton, the Defendant, Montgomery, and Hudson all stole the truck in Kentucky and drove to Tennessee together. He agreed that he had suggested that the men travel to the Leatherwood community and admitted that they broke into the Harris residence, although he gave the date of the Harris burglary as June 16, the same day as their escape from prison. He contended that only Blanton, Montgomery, and Hudson were responsible for the Cherry burglary next door. He claimed that animosity developed between himself and Montgomery and that he and the Defendant decided to separate from the others and go to Mexico. He stated that they contacted Zach Pallay on the night of June 17 and that Pallay agreed to meet on the following day to take them to Memphis to meet Quintero's brother. He claimed that in the meantime, he and the Defendant were rejoined by Blanton, Montgomery, and Hudson, and that they decided to break into the Foster residence to look for guns. When asked to explain his need for guns, Quintero answered, "I was . . . being hunted . . . . I was at war . . . with . . . the police administration." Quintero claimed that neither he nor the Defendant was involved in the McMinn burglary, but he did acknowledge participating in the Foster burglary on June 18 and, while there, taking a 12-gauge shotgun and sawing off the barrel and then sawing off the stock and barrel of a 20-gauge shotgun. While asserting that Montgomery and Hudson took a .22 caliber rifle and .30-30 caliber rifle, Quintero claimed that the Defendant did not take a weapon from the Foster residence. He maintained that when Sheriff's Deputies arrived at the Foster residence, he took a .22 caliber rifle and a box of ammunition and fled, becoming separated from the Defendant.

Quintero further stated that he and the Defendant rejoined at their rendezvous location on June 19 and met Pallay, who picked them up the next morning on June 20, and then drove them to Nashville. Quintero so testified in order to establish that he and the Defendant had left the area before the Vesters were murdered on the night of June 20. Quintero claimed that after meeting his father at a truck stop in Nashville, his father drove them to Memphis and dropped them off near the Greyhound bus station where they waited for Blanton until his arrival on June 21. He recalled that they first went to the bus station and, when asked to leave, they went to an adult bookstore nearby. According to Quintero, when they were recognized by an employee there, they left and hid out in an abandoned building near Beale Street. He testified that he telephoned his brother, Bryan, and that on June 23, his brother picked them up in Memphis and drove them "[s]traight to El Paso."

-11-

On cross-examination, Quintero admitted that he made a "conscious decision not to tell [his] lawyers about [his] claimed alibi." He described that as a "stupid decision." When asked why he sat next to his attorneys for several weeks over the course of the trial without telling them that he was not present on the date of the murders, Quintero claimed that he "never did really understand when the Vesters were killed." When asked a follow-up question to explain why he chose not to tell his counsel that he had already left the area by the time the fishermen heard shots on the night of June 20, Quintero did not respond.

The Defendant also testified at the evidentiary hearing. He described Attorney Bagwell as in charge during the course of the trial, while Attorney Roberts "was there to talk to [him] and keep [him] company." The Defendant claimed that he first met Roberts at the arraignment and complained that she had no prior experience in capital cases. He stated that he met with each of his attorneys about four times individually and twice together. According to the Defendant, neither of his attorneys asked about an alibi. He also remembered that Bagwell asked to be relieved as counsel because his law practice was suffering financially as a result of the time he was spending on this case. The Defendant further claimed that he did not learn that the Vesters were murdered on June 20 until he read the opinion of this Court in the original direct appeal. The Defendant asserted that he was with Quintero in Nashville on June 20 and that he otherwise agreed with Quintero's testimony. He denied having a weapon after the Foster burglary. The Defendant claimed that he informed his counsel that he did not kill the Vesters, burglarize their residence, or steal their car, but he did acknowledge an awareness that his prior criminal record would be used against him if he chose to testify. He conceded that he trusted Bagwell's advice not to testify and that Bagwell had informed him that he had "nothing to worry about." The Defendant, who had been involved in at least five prior criminal proceedings, further explained his failure to realize that he had an alibi for the night of June 20 because he did not pay attention and was "doing something else" during portions of the trial and was tired from talking all night to other inmates.

Jo Hall, a juror at trial and the wife of a former Humphreys County Sheriff, testified that her decision to vote for the death penalty was based upon the facts surrounding the murder of Mrs. Vester. She testified that she made no distinction between the roles of the Defendant and Quintero regarding the murders but did determine that the evidence simply did not support defense counsel's efforts to place the blame on another individual whose name she could not recall. When asked if the name "Zach Pallay" sounded familiar, she said that it did but that she had no recollection of whether he was the individual that the Defendant's counsel and Quintero's counsel had pointed to as the "real" murderer. Another juror testified that defense witness Ben Spencer, the prison barber, lost all credibility regarding the identification issue when he acknowledged wanting to change his name to

"Oogateeboogatee." Another juror stated that he saw the Defendant and Quintero brought into the courtroom in shackles at some point during the course of the trial.

As to the allegation that the jurors had seen the Defendant or Quintero in shackles, Officer Danny Warren, a Sheriff's Deputy, testified that he had transported the two men to and from jail during the course of the trial. He conceded that the Defendant and Quintero wore shackles but explained that their handcuffs and leg shackles were removed on every occasion before the jury entered the courtroom.

Zachary Pallay also testified at the post-conviction hearing. He claimed that he did not see Quintero in June of 1988 and had never seen the Defendant at any time prior to the trial. He denied that he had driven either the Defendant or Quintero to Nashville.

Attorney Roberts, who had practiced law for two years before her appointment in this case, acknowledged that she had accepted compensation for her representation at trial, but contended that she was not qualified to serve as either lead or co-counsel. She asserted that her regular practice had suffered financially as a result of her time investment in this case. She considered Attorney Bagwell as lead counsel but admitted that she had experienced "communication problems" with Bagwell after the trial and had hurriedly filed the original motion for new trial, copying some of the issues from the motion filed by Quintero's attorneys. She further acknowledged that she did not undertake an independent review of the transcript of the evidence in order to address those issues for appeal that pertained to the Defendant. As for the preparation of the appellate brief, Roberts stated, "I just assumed that Mr. Bagwell had a vast enough amount of experience in this and [had] tried a wonderful case, in my estimation, and I thought that he was handling [the preparation of the brief]." She admitted that two days before its due date, Bagwell contacted her and asked her to prepare the brief. She also remembered that Bagwell had been ordered by the Court of Criminal Appeals to appear and show cause why he should not be held in contempt for failing to file the brief timely. Roberts further agreed that Bagwell had eventually copied the appellate brief prepared by the attorneys for Quintero, and she acknowledged that a number of the issues included in the Defendant's brief were relevant only to Quintero. Claiming that she did not have sufficient time to do independent research, Roberts stated that she merely assembled the brief filed in the Court of Criminal Appeals for filing in this Court. She explained that her tardy efforts were the result of Bagwell's failure to communicate with her and further stated that she chose not to claim any compensation for her appellate work because she "didn't do anything."

When asked whether the Defendant had been seen in leg shackles during the trial, Roberts stated that his hands were not cuffed and that she and Bagwell had attempted to make sure his legs were hidden from the view of the jury. She further testified that she was

not surprised by the testimony of the two fishermen who had heard gunshots on the night of the murders, and agreed that she had received a synopsis of the State's proof in advance of trial. When asked what she would have done differently in another trial, she said, "I don't know of a lot that I could've done different." Roberts complimented Bagwell for his presentation during final argument of a timeline suggesting the Defendant might have been involved in a separate burglary at the time of the Vester murders. When asked whether the Defendant had ever told her that he had an alibi, Roberts answered, "Not to my recollection . . . ." She stated that the Defendant, Quintero, and Blanton had a "common plan that they wanted us to present," and that the Defendant had instructed her and Bagwell not to implicate either Quintero or Blanton—"[they] were going to stick together with their story . . . and they weren't going to turn on anybody." Roberts recalled that the Defendant "took a lot of his cues . . . from [Quintero]." She conceded that she could have taken a more active role in the appellate briefing process.

Shipp Weems, the Public Defender who represented Quintero, could not recall any conversation in which Quintero informed him about a possible alibi, and he never spoke with Celerino Quintero. He acknowledged that had Quintero made reference to an alibi, he would not have ignored that claim. Assistant Public Defender Steve Stack corroborated the testimony offered by Weems.

The Defendant also presented expert testimony in an effort to establish that the mitigation evidence presented by his attorneys at trial had been inadequate. Deborah Wolkhaner, a certified master social worker, had been employed by the Defendant to investigate potential mitigation evidence for the post-conviction hearing. She stated that evidence in mitigation of his crimes included a life of poverty, malnutrition, loss and abandonment, divorced parents, instability in the home, and alcohol and substance abuse. Murray Wilton Smith, a physician specializing in addictionology, testified that he had evaluated the Defendant and determined that he had first used drugs at the age of nine or ten and that by the age of twelve or thirteen was using alcohol and Valium in large amounts, which had an adverse effect on his mental development. He described the Defendant's only role models as other prison inmates. Dr. Pamela Auble, an expert in neuropsychology, also testified on behalf of the Defendant. Dr. Auble determined that the Defendant was of average intelligence but had a history of drug abuse and impulsive behavior. Dr. Patti Van Eys, a clinical psychologist specializing in the area of child maltreatment and child psychopathology, did not examine the Defendant but did review the evaluations by Wolkhaner and Dr. Auble. In the opinion of Dr. Van Eys, the Defendant had several disruptions during his childhood development because of his parents' divorce and his mother's death. Some of the Defendant's family members likewise testified to his troubled childhood.

John Oliva, an attorney with considerable experience in criminal law and capital cases, testified that the work performed by the Defendant's trial counsel fell below the required standard. He cited several standards promulgated by the American Bar Association and provided specific reference to guidelines that he believed the Defendant's trial counsel failed to meet. Paul Morrow, an attorney associated with the Capital Case Resource Center during the late 1980s and early 1990s, testified that he reviewed Attorney Bagwell's invoice for services on behalf of the Defendant, which included three references to conferences that Bagwell claimed to have had with Morrow. He denied having talked with Bagwell about the Defendant's case and asserted that the records he maintained at the Capital Case Resource Center during this period of time made no reference to any such conferences. Thomas Watson, also an attorney, testified that Bagwell had claimed in his invoice to have conferred with Watson on three separate occasions. He testified that he had never met with Bagwell regarding his preparation for the trial involving the Defendant.

In summary, the Defendant claimed that his counsel were ineffective by failing to adequately investigate and present the defense of alibi at the trial; by failing to properly challenge the testimony of Dr. Harlan as to the amount of time it took for Mrs. Vester to die after the infliction of her wounds; by failing to effectively challenge the testimony of the funeral home employees who described the Defendant, Quintero, and Blanton as having long hair and beards; by failing to adequately prepare for the penalty phase of the trial as it related to the Defendant's social history and mental health; and, as to Attorney Roberts, by failing to possess or acquire the qualifications to serve as counsel in a capital case. The Defendant also asserted that his attorneys basically did nothing during the direct appeal.

At the conclusion of the proceeding, Judge Burch first denied relief on the petition for writ of error coram nobis before considering the grounds presented for post-conviction relief. In considering the claim of "new" evidence, Judge Burch did not make reference to any of the proof offered in support of post-conviction relief and only addressed the evidence presented at trial and that alleged to be newly discovered:

> [The Defendant] would have the [c]ourt believe the testimony of inmates Cauthern and King that Blanton, before he died, stated to them that Blanton would testify to exonerate [the Defendant]. They testified that Blanton would not so testify during his life[time] because it would damage his own appeal. It may be safely assumed that Blanton's case would be on a similar time line as that of [the Defendant]. Had Blanton been alive and testified to exonerate [the Defendant], it still would have damaged his own post-conviction case. In short, the motive for Blanton to remain silent would still exist if Blanton were alive. [The Defendant] would have the [c]ourt believe that Blanton, a twice-convicted murderer, would have sacrificed his

own case (and possibly his life) to aid [the Defendant] and to insure that justice was served.

Also, Blanton's supposed statement to inmate King was to the effect that Blanton alone killed Mr. Vester from inside the house when Mr. Vester resisted Blanton's efforts to steal the Vesters' car. Neither inmate indicated that "Zac[h]" assisted in committing the murders, only that he was present. These inmates' recitation of Blanton's supposed statement do not conform to the evidence of the Vester[] murders. To believe this statement, this [c]ourt would have to accept the fact that Blanton killed the Vesters using two different firearms and a knife. One inmate testified that Blanton mentioned an "old man" while the other testified that "they" resisted and he had to kill "them." King testified that Blanton killed the "old man" in order to steal his truck when in fact it was a car that was stolen. The supposed statement of Blanton simply does not square with the known facts.

Even assuming by some miracle that Blanton had testified . . . as the inmate witnesses related his statements to them, Blanton would have been devastated on cross-examination using the known facts of the murders to such an extent that his entire testimony would have been unbelievable.

The [c]ourt finds the proffered testimony would not have altered the result of [the Defendant's] trial. There is no "reasonable probability" that the result of the proceeding would have been different.

After ruling for the State on the newly discovered evidence issue, Judge Burch found no merit to any of the post-conviction claims regarding either the guilt or penalty phases of the trial, concluding that as to each and every allegation, the Defendant failed to meet his burden of proof demonstrating deficiency in performance or prejudice in the result. Judge Burch further found from the proof offered that although the Defendant was in leg shackles during the penalty phase of the trial, the shackles were hidden from the jury's view, and that he was not in shackles during the guilt phase of the trial. All other claims regarding the jury instructions as to lesser included offenses and aggravating circumstances were rejected. Judge Burch concluded, however, that counsel's performance in the direct appeal was indeed deficient, commenting as follows:

[A]ppellate counsels' performance on appeal was abominable. Counsels' performance fell far below the standard expected of counsel in the appeal of a capital case (or any other case for that matter). Counsels' appellate briefs (both in the Court of Criminal Appeals and the Supreme Court) [were] a copy

-16-

of [those] filed by . . . Quintero, often even containing allegations relating to Quintero alone. Even then, the brief was filed late in the Court of Criminal Appeals. The cause of this failure was different for each counsel. Mr. Bagwell, lead counsel, had apparently begun his mental and physical decline the reason for which this [c]ourt can only speculate. The onset was apparently rapid and complete. He was, with varying degrees of success, attempting to maintain a facade of normality while his actual performance dropped to below substandard levels. He apparently devoted little time to his practice of law. Ms. Roberts, on the other hand, was placed in an untenable position by Mr. Bagwell's decline. The proof at the [p]ost-[c]onviction hearing establishe[d] that Ms. Roberts began to have communication problems with Mr. Bagwell after the conviction[s] in this case. Ms. Roberts expected that Mr. Bagwell would draft the motion for new [trial] but, in checking . . . , she discovered that the motion had not been filed. Therefore, she hurriedly filed one herself. At the time, Ms. Roberts didn't notice that Mr. Bagwell was not attending to his practice. Upon consulting with Mr. Bagwell, Ms. Roberts was advised that Mr. Bagwell had an individual in his office who was engaged in condensing the transcript into a narrative account. She received the document "a couple of days before the brief was due." Ms. Roberts continued to call Mr. Bagwell's office asking if there was anything that she should do in preparation for the appeal. She did not receive a response to her inquiries. At that point, Ms. Roberts was not overly concerned. She testified that Mr. Bagwell "had a vast enough amount of experience in this and [had] tried a wonderful case, in my estimation, and I thought [that] he was handling it." With regard to the writing of the brief [in] the Court of Criminal Appeals, Ms. Roberts testified that Mr. Bagwell assured her that they would get an extension of time in which to file the brief and that they would get together about the brief. At that time, Ms. Roberts had no cause to think that he would . . . do otherwise. As the time for filing the brief came and passed, Ms. Roberts became increasingly anxious concerning the filing of the brief. Attempts to contact Mr. Bagwell were usually unsuccessful. As secondary counsel, Ms. Roberts [was] understandably reticent to "take matters in her own hands" since Mr. Bagwell had assured her that the brief was being prepared. Later, Mr. Bagwell told her that she would have to write the brief. By the time he told her this, there was not sufficient time . . . to prepare an adequate brief. Ultimately, Mr. Bagwell filed the brief, which was essentially a copy of Quintero's brief. A number of the issues in the brief filed by Mr. Bagwell did not pertain to [the Defendant].

The proceedings in the Supreme Court went about the same as in the Court of Criminal Appeals except that Ms. Roberts waited for Mr. Bagwell to

-17-

file the brief and, when he did not, she took his previous brief, edited it and filed it on time. Even so, she did not have time to file a [thorough] brief. Ms. Roberts testified that it was "humiliating doing it the way that I did." She said it was an embarrassment for her to have her name associated with such shoddy work. Ms. Roberts has practiced before this [c]ourt for many years and this [c]ourt has never known her to be unprepared or even poorly prepared. She testified that, in her sol[o] practice, she had never asked for an extension to file an appellate brief. Mr. Bagwell did the oral arguments in both appellate courts.

There is no question that the quality of the appellate representation of [the Defendant] fell far below the standard expected of appellate counsel in a capital case. Mr. Bagwell's failure was due to his mental and physical decline and Ms. Roberts['] due to her reliance upon Mr. Bagwell and her uncertainty concerning what action she should take because of her role as secondary counsel. At the time, Ms. Roberts had no reason to think that Mr. Bagwell would not perform the functions which he told her he would. . . . In any event, [the Defendant] did not receive the level of representation to which he was entitled. The answer to the first question of the Strickland inquiry is that appellate counsel was ineffective.

(Citations omitted.)

While Judge Burch ruled that the level of counsel's performance on appeal was deficient, he also found that no prejudice resulted. In consequence, post-conviction relief was denied.

After a lengthy recitation of the proof at trial and in the post-conviction proceedings, the Court of Criminal Appeals affirmed, holding first that Judge Burch had not abused his discretionary authority by denying coram nobis relief. Quintero, 2008 WL 2649637, at *35. The Court of Criminal Appeals further ruled that Judge Burch had properly denied post-conviction relief, agreeing that the performance of counsel was deficient in the direct appeal, but also ruling that the Defendant had been unable to establish any prejudice as a result of the inadequate representation. Id. at *56-60. Moreover, the court concluded that even though the Defendant's attorneys had basically copied Quintero's brief, there had been a meaningful appellate review of his convictions and sentences because the defense theories for the Defendant and Quintero were essentially the same. Id. at *58.

Because of obvious deficiencies in the quality of the brief filed by counsel for the Defendant in the direct appeal of a capital case, this Court by per curiam order granted the

Defendant a delayed appeal, remanded to the trial court for the appointment of new counsel with the opportunity to amend the motion for new trial, and stayed the post-conviction proceedings pending the final disposition of the delayed appeal. This Court further ruled as follows:

> The [Defendant] shall file his motion for new trial in the Circuit Court for Humphreys County within thirty days from the issuance of this order. If such motion is denied, then the [Defendant] shall proceed with the delayed appeal under the Tennessee Rules of Appellate Procedure. The procedure after the delayed appeal shall be governed by Tennessee Supreme Court Rule 28, section 9[(D)](3), which states:
>
> > (a) Where a delayed appeal is granted and the petitioner is unsuccessful on appeal, and new issues cognizable in a post-conviction proceeding result from the handling of the delayed appeal, the petitioner may amend the original post-conviction petition to include such new issues.
> >
> > (b) Where the post-conviction appeal has been stayed in the [appellate court], the case may be remanded to the trial court for the taking of evidence on any new issues resulting from an unsuccessful delayed appeal.

Quintero v. State, No. M2005-02959-SC-R11-PD (Tenn. Oct. 30, 2009) (per curiam order) (fourth alteration in original) (citations omitted).

Upon remand, Senior Judge Allen W. Wallace, who had presided over the trial and had denied the Defendant's original motion for new trial, was assigned to hear further arguments by the Defendant on his original motion for new trial and any amendments filed by his new counsel, Patrick T. McNally and Paul J. Bruno. Although counsel filed a new motion in 2009 and an amended motion in 2011, Judge Wallace died before he could hold a hearing. Upon the untimely death of Judge Wallace, Senior Judge Jon Kerry Blackwood was assigned as a replacement for the delayed appeal.

### D. Delayed Appeal

As a preliminary matter, Judge Blackwood confirmed his ability to serve as a successor judge to Judge Wallace and explained that the proceedings would address the Defendant's original motion for new trial filed in 1992, as well as the new and amended motions filed in November of 2009 and January of 2011. Judge Blackwood announced that he would consider evidence from the post-conviction proceedings only as it related to the

motions for new trial, but he declined to address any claims of ineffective assistance of counsel at trial. Judge Blackwood did consider each of the following issues: (1) the sufficiency of the evidence; (2) the prosecutor's opening statements and closing arguments; (3) prosecutorial misconduct; (4) the selection and empaneling of the jury and grand jury; (5) the jury instructions provided at both phases of trial; (6) various evidentiary rulings by the trial court; (7) the consolidation of presentments and defendants at trial; (8) the use of shackles on the Defendant during both phases of his trial; (9) testimony given by several experts; (10) the constitutionality of the aggravating circumstances found by the jury to impose a sentence of death; and (11) the constitutionality of the death penalty in Tennessee. Judge Blackwood also considered a re-asserted claim by the Defendant that he was entitled to a writ of error coram nobis based on newly discovered evidence, practically all of which had been filed and heard during the post-conviction proceedings before Judge Burch.

At the hearing conducted by Judge Blackwood, the Defendant, who served as his only witness, provided testimony to supplement that offered at the post-conviction hearing. In seeking a new trial based upon newly discovered evidence, the Defendant relied primarily upon the testimony of Ronnie Cauthern, Terry Lynn King, and Celerino Quintero. He admitted to being involved in the burglaries in the Leatherwood community but insisted that he was not in that area at the time of the Vester murders, claiming that he was already in Memphis with Quintero. He contended that Quintero's father had driven from Texas to Nashville to meet them and then driven them to Memphis, dropping them off near the Greyhound bus station there. He asserted that Quintero's father could not wait for the arrival of Blanton because he had business back in Texas. The Defendant also introduced a telephone record indicating that on June 20, 1988, at 11:33 p.m., a phone call was made from one of the telephones at the bus station to the same area code as calls that had been made to Quintero's brother, Bryan, from one of the burglarized residences. In response to cross-examination, the Defendant offered various excuses for not informing his trial counsel about his alibi evidence—such as he was not paying close attention during the trial, did not think the dates were relevant, and "didn't [even] know [he] had an alibi."

After the conclusion of the hearing, Judge Blackwood denied the Defendant's motions for new trial and his petition for coram nobis relief. On appeal to the Court of Criminal Appeals, the Defendant claimed that Judge Blackwood should have granted him a new trial on the following grounds: (1) Judge Wallace died before the motions for new trial had been fully resolved; (2) new, exculpatory evidence had been discovered after the trial; (3) the convicting evidence was insufficient; (4) the jury observed the Defendant in shackles during the course of the trial; and (5) his trial counsel were ineffective in the investigation for having failed to locate the telephone call from the Greyhound bus station in Memphis on the date of the murders. The Court of Criminal Appeals rejected all claims and affirmed the convictions and sentences. Hall, 2013 WL 5761311, at *23.

The Defendant has raised the following issues for review by this Court, many of which mirror those filed in the Court of Criminal Appeals: (1) whether Judge Blackwood, as a successor judge, was required to grant a new trial after the death of Judge Wallace; (2) whether the Defendant is entitled to a new trial based upon newly discovered evidence; (3) whether the evidence is sufficient to support his convictions; (4) whether trial counsel were ineffective; (5) whether the Defendant was improperly shackled in the presence of the jury; (6) whether the death penalty is unconstitutional; and (7) whether appellate review of death sentences in Tennessee is substantively and procedurally inadequate. The Defendant has also sought to preserve "all issues from his original direct appeal, on post-conviction, and presented in the most recent motion for new trial pleadings."

In an order filed August 22, 2014, this Court expressed its particular interest in the first two issues raised by the Defendant, which relate to Judge Blackwood's role as a successor judge and the impact of the alleged newly discovered evidence submitted in support of the Defendant's re-asserted petition for writ of error coram nobis. We will also address the use of shackles on the Defendant during his trial. As for the sufficiency of the evidence and the propriety of the sentence of death, we will briefly address these issues that were previously resolved by the original direct appeal. We decline to consider any of the Defendant's claims as to the ineffective assistance of trial counsel because those issues are being held in abeyance pending the final disposition of this delayed appeal. As indicated in our October 30, 2009 "Corrected Order," the Defendant will be permitted to amend his original post-conviction petition to include any issues that may arise from the handling of this delayed appeal. Finally, in our view, any remaining claims raised by the Defendant but not addressed in this opinion were satisfactorily addressed and rejected in prior decisions by this Court, the Court of Criminal Appeals, Judge Blackwood, and Judge Wallace. See State v. Hall, 976 S.W.2d 121 (Tenn. 1998) (direct appeal); State v. Hall, No. M2012-00336-CCA-R3-DD, 2013 WL 5761311 (Tenn. Crim. App. Oct. 22, 2013) (delayed appeal).

### III. Analysis

As indicated, we will address the following issues in this appeal: (1) whether Judge Blackwood, as the successor judge, was required to grant a new trial after the death of Judge Wallace; (2) whether the Defendant is entitled to a new trial based on "newly discovered evidence" that was presented during the post-conviction proceedings and supplemented at the hearing before Judge Blackwood; (3) whether the Defendant was improperly shackled in the presence of the jury; (4) whether the evidence presented at trial was sufficient to support the convictions; and (5) whether the sentence of death was imposed in accordance with constitutional and statutory standards.

## A. Role of the Successor Judge

The Defendant first contends that Judge Blackwood, as a successor judge, was obliged to grant the motions for new trial due to the death of Judge Wallace, the original trial judge. Tennessee Rule of Criminal Procedure 25 sets forth the general circumstances under which a successor judge may be appointed to perform the duties of an original trial judge:

(b) AFTER VERDICT OF GUILT. —

(1) IN GENERAL. — After a verdict of guilty, any judge regularly presiding in or who is assigned to a court may complete the court's duties if the judge before whom the trial began cannot proceed because of absence, death, sickness, or other disability.

(2) GRANTING A NEW TRIAL. — The successor judge may grant a new trial when that judge concludes that he or she cannot perform those duties because of the failure to preside at the trial or for any other reason.

The Defendant has challenged two of the duties performed by Judge Blackwood as a successor judge: (1) approving the verdict as thirteenth juror; and (2) ruling upon the various motions for new trial.

## 1. Approving a Verdict as Thirteenth Juror

Tennessee Rule of Criminal Procedure 33(d) provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This procedural rule has been described as "the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). The rationale behind the thirteenth juror rule is that "[i]mmediately after the trial, the trial court judge is in the same position as the jury to evaluate the credibility of witnesses and assess the weight of the evidence, based upon the live trial proceedings." State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995). Although trial judges have a "mandatory duty to serve as the thirteenth juror in every criminal case," a judge is not required to provide a specific statement on the record to indicate his or her approval of the jury's verdict. State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995).

In rare cases, a successor judge may be appointed after a verdict of guilt has been rendered by a jury but before the original trial judge has had an opportunity to issue a ruling

as the thirteenth juror.[3] When this occurs, the successor judge, unlike the original trial judge, is not in the same position as the jury and did not have the advantage of evaluating the credibility of witnesses and assessing the weight of the evidence based upon live trial proceedings. See State v. Brown, 53 S.W.3d 264, 275 (Tenn. Crim. App. 2000) ("[I]t is difficult to see how a trial judge who has not heard the evidence and who has not seen the witnesses can act as the thirteenth juror when weight and credibility are issues."). In these circumstances, our Court of Criminal Appeals has held that the successor judge's consideration of whether he or she is able to perform the duties of the original trial judge "must include an assessment of his or her ability to act as a thirteenth juror, including witness credibility." State v. Nail, 963 S.W.2d 761, 765 (Tenn. Crim. App. 1997). This assessment requires the successor judge "to determine the extent to which witness credibility was a factor in the case and the extent to which he [or she] ha[s] sufficient knowledge or records . . . in order to decide whether the credible evidence . . . adequately supported the verdict." Id. at 766. More recently, in State v. Ellis, this Court elaborated upon the standards for evaluating witness credibility. No. E2011-02017-SC-R11-CD, 2015 WL 154209 (Tenn. Jan. 13, 2015). Recognizing that "the cold record of a trial generally will reflect all but one of the components that comprise" witness credibility, id. at *13, we adopted a rebuttable presumption in favor of the successor judge ruling as thirteenth juror and held that "[o]nly if the record indicates that weighing the evidence would require an assessment of witness demeanor should the successor judge decline to act as the thirteenth juror," id. at *15.

In this instance, the Defendant contends that Judge Blackwood abused his discretion by determining that he could act as the thirteenth juror. The Defendant points out that Judge Blackwood, as the successor judge, did not hear the evidence or see the witnesses, and, therefore, could not make the necessary credibility determinations before deciding whether the original jury verdicts were supported by the evidence. Notably, the Defendant has not argued that Judge Wallace, as the original trial judge, failed to rule as thirteenth juror or otherwise erred in this regard.

In our view, it was unnecessary for Judge Blackwood to act as the thirteenth juror at the time of the delayed appeal because that function had previously been performed by Judge Wallace immediately following the original trial. While Judge Wallace may not have specifically stated that he acted as the thirteenth juror, he was not required to do so. Moreover, it is clear from the record that Judge Wallace approved the verdicts rendered by the jury. Indeed, after Judge Blackwood stated that he was performing the court's duties as thirteenth juror, he observed "that Judge Wallace also previously ruled as thirteenth juror in

---

[3] Because the thirteenth juror rule contemplates that the trial judge will evaluate the evidence immediately after the jury has rendered its verdict, trial judges should act expeditiously in ruling as the thirteenth juror and should not delay this ruling until the hearing on a motion for new trial.

these cases." In addition to his denial of the original motion for new trial, Judge Wallace approved the verdicts and sentences in the Tennessee Supreme Court Rule 12 report that was filed following the trial in this matter. Because the function of the thirteenth juror was performed by Judge Wallace after the trial, Judge Blackwood was not required to assess the evidence as thirteenth juror in this delayed appeal. Indeed, when this Court entered its October 30, 2009 "Corrected Order" granting the delayed appeal, we directed the Defendant to file a motion for new trial with the assistance of newly appointed appellate counsel; we did not give any indication that the trial court would also need to make a new thirteenth juror determination. In consequence, we will not disturb the thirteenth juror ruling made by Judge Wallace immediately following the trial, and, therefore, we need not determine whether Judge Blackwood was in a proper position to reconsider the thirteenth juror ruling in this delayed appeal.[4]

## 2. Ruling Upon a Motion for New Trial

Initially, it is important to note that the Defendant has not asserted any claim as to the merits of Judge Blackwood's decision to deny the various motions for new trial except as pertains to the alleged newly discovered evidence, which is raised in the coram nobis petition, and the use of shackles on the Defendant. Instead, the Defendant primarily attacks the procedures employed by Judge Blackwood in determining whether he was able to rule upon the motions as a successor judge. Specifically, the Defendant contends that Judge Blackwood "was required to grant [the Defendant's motions for new trial] under the *ex post facto* clause of the Constitution of the State of Tennessee and the law regarding judging the credibility of the witnesses."

The first aspect of the Defendant's argument is based upon a statute that governs the circumstances in which a successor judge may properly rule upon a motion for new trial. Tennessee Code Annotated section 17-1-305 currently provides as follows:

> When a vacancy in the office of trial judge exists by reason of death . . . , after verdict, but before the hearing of the motion for new trial, the trial judge's successor shall rule on the defendant's motion for new trial after the successor judge has reviewed the transcript and entire record of the trial.

Tenn. Code Ann. § 17-1-305 (2009). At the time of the offenses and the trial of this case,

---

[4] Although neither the State nor the Defendant has presented an argument as to the standard of appellate review that should apply to the evaluation of witness credibility by a successor judge when determining whether he or she is able to rule as thirteenth juror, this Court recently decided the issue as a matter of first impression in Ellis, 2015 WL 154209, at *15 ("[A]n appellate court should review a successor judge's decision about whether he can act as the thirteenth juror under a de novo standard of review.").

however, the statute provided that in such circumstances "<u>a new trial shall be granted</u> the losing party if the motion therefor shall have been filed within the time provided by rule of the court and be undisposed of at the time of such death." Tenn. Code Ann. § 17-1-305 (1980) (emphasis added). The Defendant asserts that he has been prejudiced by this change in the law because a successor judge now has the discretion to consider whether he is able to rule upon a motion for new trial and is no longer <u>required</u> to grant a new trial after the death of the original trial judge.

We need not address the argument by the Defendant that this "new law presents a prejudicial retrospective change . . . violating the *ex post facto* clause of the Constitution of the State of Tennessee." Even if we were to conclude that the 1980 version of section 17-1-305 should apply to Judge Blackwood's 2012 decision that he was qualified to rule upon the motions for new trial, the Defendant would not be entitled to relief under the terms of the prior statute. The 1980 statute required a successor judge to grant a new trial if a motion for new trial had been filed but remained "undisposed of at the time of [the original trial judge's] death." Tenn. Code Ann. § 17-1-305 (1980). In this case, Judge Wallace, the original trial judge, denied the Defendant's original motion for new trial in 1992, nearly twenty years before his death. Thus, the only motion for new trial that was filed during the effective date of the prior statute was not "undisposed of at the time of [Judge Wallace's] death." Likewise, the new and amended motions for new trial, which were filed in November of 2009 and January of 2011, would not satisfy the plain language of the 1980 statute because those motions were not "filed within the time provided by rule of the court." At the time of the Defendant's trial, as now, Tennessee Rule of Criminal Procedure 33(b) required that a motion for new trial be filed "within thirty days of the date the order of sentence is entered." The 2009 and 2011 motions were not presented to Judge Wallace within thirty days of the order of the Defendant's sentences because these motions exist only by virtue of this delayed appeal. Because none of the Defendant's motions for new trial fall within the scope of the prior statute, its terms are inapplicable and do not afford a basis for relief.

Applying the current version of Tennessee Code Annotated section 17-1-305, the Defendant contends that Judge Blackwood should not have ruled upon the motions for new trial because he was unable to weigh the credibility of the witnesses. The determination by a successor judge when assessing whether he or she may perform the duties of the original trial judge necessarily includes an evaluation of the extent to which witness credibility is an issue. <u>See</u> Tenn. Code Ann. § 17-1-305 (2009); Tenn. R. Crim. P. 25(b)(2); <u>State v. Blanton</u>, No. M2007-01384-CCA-R3-CD, 2009 WL 537558, at *8-10 (Tenn. Crim. App. Mar. 4, 2009). Our Court of Criminal Appeals has explained that because a "successor judge was not at the trial to see any of the witnesses testify and would [be] unable to make a credibility determination from the written record[, <u>a] successor judge cannot rule on a motion for a new</u>

trial if witness credibility is an overriding issue." State v. Biggs, 218 S.W.3d 643, 655 (Tenn. Crim. App. 2006) (emphasis added); see also State v. Gillon, 15 S.W.3d 492, 502 (Tenn. Crim. App. 1997) ("[A] judge whose first exposure to the case [is] presiding over the motion for new trial [may] rule on the motion if the record [is] available so long as witness credibility [is] not an overriding issue."). Likewise, this Court has ruled that "[w]hen witness credibility is the primary issue raised in the motion for new trial, the successor judge may not approve the judgment and must grant a new trial." State v. Cobbins, No. E2012-00448-SC-R10-DD, slip op. at 2 (Tenn. May 24, 2012) (per curiam order) (citations and internal quotation marks omitted).

The Defendant contends that credibility was "unequivocally an overriding issue in this case" and that Judge Blackwood erred by ruling otherwise. Initially, we make two observations. First, to the extent the Defendant has argued the issue of witness credibility as it relates to Judge Blackwood's ability to approve the verdicts as thirteenth juror, we have already determined that the thirteenth juror ruling by Judge Blackwood was unnecessary. Second, to the extent the Defendant has challenged the credibility of the witnesses who testified at the post-conviction hearing, we again point out that the post-conviction proceedings have been stayed pending the resolution of this delayed appeal. Thus, as a general matter, the evidence presented at the hearing on the post-conviction petition is not within the scope of this appeal. The Defendant contends, however, that because Judge Blackwood agreed to consider some of the evidence from the post-conviction proceedings when ruling upon the motions for new trial, Judge Blackwood erred by determining that he could rule upon the motions without assessing the credibility of the testimony presented during the post-conviction hearing. The State responds that Judge Blackwood could not have erred because he relied upon the credibility determinations made by the post-conviction court—determinations that were affirmed by the Court of Criminal Appeals but are now being held in abeyance by this Court.

In an order dated August 10, 2011, Judge Blackwood ruled that he would consider "[t]he testimony or deposition testimony of the following witnesses": Ronnie Cauthern, Terry Lynn King, Celerino Quintero, Derrick Quintero, the Defendant, Zachary Pallay, Henry Clay Skeleton, and Officer Danny Warren, each of whom testified at the evidentiary hearing on the Defendant's petition for post-conviction relief. It is clear from Judge Blackwood's order that he intended to consider this evidence as part of the Defendant's motions for new trial, which also re-asserted the petition for writ of error coram nobis. The post-conviction testimony of Cauthern, King, Celerino Quintero, Derrick Quintero, the Defendant, and Pallay was presented to establish the alleged newly discovered evidence to support an alibi defense. In consequence, their testimony was relevant only in relation to Judge Blackwood's consideration of the coram nobis petition, and was not relevant to any of the other issues raised in the motions for new trial. Because we will address the coram nobis petition in a

separate section of this opinion, we need not consider whether the credibility of these witnesses was an overriding issue that could have affected Judge Blackwood's ability to rule upon the motions for new trial.

As for the remaining two post-conviction witnesses named in the August 10, 2011 order—Skeleton and Officer Warren—Judge Blackwood specified that he would consider their testimony as it related to the use of shackles on the Defendant. Because this is an issue raised in the Defendant's new and amended motions for new trial that were filed as a part of this delayed appeal, we agree that this evidence was properly considered by Judge Blackwood when determining whether he could rule on the motions for new trial. The Defendant has also identified the testimony of several witnesses from the original trial in support of his claim that witness credibility was an overriding issue and, therefore, Judge Blackwood was precluded from considering the motions for new trial as a successor judge. Specifically, the Defendant contends that his trial testimony and that of Pallay, Murray Parker, Leroy Love, Thomas Pryor, Ben Spencer, and James Bruce present critical credibility issues.

We have carefully reviewed the credibility arguments made by the Defendant in light of the issues raised in each of his motions for new trial. In our view, witness credibility was not presented as an overriding issue that might have rendered Judge Blackwood unable to rule upon the motions. The Defendant raised at least sixty issues for consideration by Judge Blackwood. In the original motion for new trial, the majority of the issues related to evidentiary and procedural rulings by Judge Wallace and the empaneling and instructing of the jury. The only issue that challenged the credibility of a witness was the allegation that Judge Wallace erred by not allowing the Defendant to impeach Pallay with prior bad act evidence. In addition to reiterating the issues raised in the original motion for new trial, the majority of the issues raised in the Defendant's new and amended motions for new trial related to the sufficiency of the evidence, the ineffective assistance of trial counsel, the use of shackles on the Defendant, prosecutorial misconduct, and the constitutionality of the death penalty. The only additional issue raised for consideration in the delayed appeal that directly related to witness credibility was an allegation that Dr. Harlan had provided false and misleading testimony.

We note, however, that the Defendant has not identified Dr. Harlan as one of the witnesses in support of his claim that credibility is an overriding issue. In any event, it is our conclusion that the few issues challenging the veracity of a witness' testimony, when considered within the context of the three motions for new trial, are not sufficient to establish witness credibility as the overriding or primary issue presented on appeal. Rather, the bulk of the challenges raised by the Defendant are directed at the various procedural and evidentiary decisions made by Judge Wallace prior to and during the trial, the statements

made by the prosecutors, the ineffectiveness of trial counsel, the sufficiency of the evidence, and the constitutionality of the death sentencing scheme in Tennessee. In consequence, the Defendant has not established that witness credibility was such an overriding issue that Judge Blackwood was unable to consider the motions for new trial.[5] We note, again, that in this delayed appeal the Defendant has not challenged the merits of Judge Blackwood's decision to deny the motions for new trial on any basis other than the alleged newly discovered evidence, which we will address within the scope of the Defendant's petition for coram nobis relief, and the use of shackles on the Defendant in the presence of the jury, which we will also address in a separate section of this opinion.

## B. Coram Nobis

The Defendant contends that he is entitled to a new trial based upon "newly discovered evidence" that was presented during the post-conviction proceedings and re-asserted in this delayed appeal. Petitions for writs of error coram nobis in criminal cases are governed by Tennessee Code Annotated section 40-26-105(b) (2012), which provides as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

In State v. Mixon, 983 S.W.2d 661, 673 (Tenn. 1999), this Court described the writ of error coram nobis as an extraordinary procedural remedy which rarely produces results favorable to a criminal defendant.

The burden of proof for the grant of coram nobis relief is indeed heavy. Trial courts are required to grant a new trial based on newly discovered evidence only if the defendant

_____

[5] While our recent decision in Ellis discussed the standards to be applied by a successor judge when evaluating witness credibility prior to ruling as thirteenth juror, we acknowledge here the closely related question of whether a successor judge can rule on a motion for new trial when witness credibility is the primary issue raised in the motion. See Ellis, 2015 WL 154209, at *8 & n.7. Because, however, in this instance we have determined that witness credibility was not an overriding issue raised in the various motions for new trial, we need not decide whether or how the holding from Ellis may apply in this context.

-28-

proves each of the following three requirements: (1) that he or she was reasonably diligent in seeking the evidence; (2) that the evidence is material; and (3) that the evidence is likely to change the result of the trial. State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)). Newly discovered evidence that is "merely cumulative or 'serves no other purpose than to contradict or impeach' does not warrant" coram nobis relief. Wlodarz v. State, 361 S.W.3d 490, 499 (Tenn. 2012) (quoting State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995)). Moreover, the credibility of the newly discovered evidence is of paramount importance to its consideration in a petition for writ of error coram nobis. This Court has held that

> in a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007) (first emphasis added); see also State v. Bowers, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001) ("An assessment of the witnesses' credibility by the trial court is essential in order for the trial court to determine whether the evidence is likely to change the result of the trial." (emphasis added)). The decision whether to grant coram nobis relief rests within the sound discretion of the trial court. Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010).

The Defendant presented his alleged "newly discovered evidence" during the evidentiary hearing on his petition for post-conviction relief, which was conducted by Judge Burch, and later supplemented that evidence with his own testimony at the evidentiary hearing on remand for the delayed appeal, which was conducted by Judge Blackwood. At the hearing before Judge Burch, death row inmates Cauthern and King essentially testified that prior to his death in 1999, Blanton had claimed sole responsibility for the murders of the Vesters and had expressed to Cauthern and King that the Defendant and Quintero had not participated in the crimes. The Defendant, Quintero, and Quintero's father testified in an attempt to establish an alibi defense, asserting that the Defendant and Quintero had already left the area when the Vesters were murdered on June 20, 1988. At the hearing before Judge Blackwood, the Defendant pointed to the testimony of Cauthern, King, and Celerino Quintero as the primary basis of his effort to be granted a new trial based upon newly discovered evidence.

Judge Burch and Judge Blackwood both denied the Defendant's petition for writ of error coram nobis, and the Court of Criminal Appeals affirmed these decisions in the post-conviction case and in this delayed appeal. Hall, 2013 WL 5761311, at *19; Quintero, 2008 WL 2649637, at *35. At each stage of these proceedings, the credibility of the Defendant's "newly discovered evidence" has been called into question. Judge Burch, for example, was highly skeptical that "Blanton, a twice-convicted murderer, would have sacrificed his own case (and possibly his life) to aid [the Defendant] and to insure that justice was served." He also noted that Blanton's alleged statement to Cauthern and King "simply [did] not square with the known facts." On post-conviction review, the Court of Criminal Appeals further observed that Blanton's alleged statement to Cauthern and King was necessarily made prior to Blanton's death in 1999, which was well over two years before either of the two men notified the Defendant, Quintero, or their counsel of the contents of Blanton's statement. Quintero, 2008 WL 2649637, at *34. The court described the timing of the discovery of the proffered evidence as "suspicious," having an adverse effect upon the credibility of the testimony. Id. Later, on review of Judge Blackwood's decision in the delayed appeal, the Court of Criminal Appeals again expressed its doubts as follows:

> The foundation of the [Defendant's] entire newly discovered evidence claim simply cannot stand on its own. He would have the courts believe that he did not reveal evidence supporting his alibi because he did not pay attention during the trial in which his life was literally on the line. Like Judge Blackwood, we choose not to believe the [Defendant's] explanation. His self-serving attempt now to manufacture a different defense about which he should well have already known does not gain him any favor. The [Defendant's] testimony is simply not credible. Similarly, the testimony of Cauthern and King is equally unbelievable . . . .

Hall, 2013 WL 5761311, at *19 (emphasis added).

We agree with these statements as to the veracity of the alleged newly discovered evidence. In our view, credibility was an issue only in the sense that the testimony of the Defendant, Quintero, Quintero's father, and the two witnesses on death row, each claiming that a deceased inmate had taken full responsibility for the murders, was absolutely incredible—as found by Judges Burch and Blackwood. Moreover, neither the Defendant nor Quintero could explain why they had not informed their attorneys about their alibis prior to trial. From all appearances, the Defendant has simply attempted to take advantage of Blanton's death in order to manufacture an alternative defense which, if true, could have been presented at trial. In consequence, Judge Blackwood did not abuse his discretion by denying the re-asserted petition for writ of error coram nobis because the Defendant is not entitled to a new trial based upon "newly discovered evidence."

-30-

**C. Use of Shackles**

The Defendant contends that he is entitled to a new trial because one of the jurors, Henry Clay Skeleton, observed him in shackles "during the course of the trial." In his brief to this Court, the Defendant has not specified at which stage of the trial Skeleton allegedly saw him wearing shackles. As Judge Blackwood noted, the Defendant raised the shackling issue in his new and amended motions for new trial, but only as to the penalty phase. When the Defendant attempted to argue, in a post-hearing brief, that he had also been improperly shackled during the guilt phase, Judge Blackwood dismissed this claim as unsupported by the testimony of Skeleton and Officer Warren, the Deputy Sheriff who was responsible for transporting the Defendant to and from the courtroom each day for trial. The Court of Criminal Appeals affirmed, finding that the record did not support the Defendant's claim that he was shackled during the guilt phase of the trial, and that although the Defendant was shackled during the penalty phase and may have been observed by Skeleton at that time, the use of shackles was permissible under the circumstances of this case and did not influence the sentences imposed by the jury. Hall, 2013 WL 5761311, at *21-22.

It is a well-settled principle of due process that every defendant in a criminal case must be afforded the "physical indicia of innocence." Kennedy v. Cardwell, 487 F.2d 101, 104 (6th Cir. 1973); Mobley v. State, 397 S.W.3d 70, 100 (Tenn. 2013). The use of shackles during a trial, for example, has been specifically condemned absent certain safeguards designed to assure that it would not influence the issue of innocence or guilt. State v. Smith, 639 S.W.2d 677, 681 (Tenn. Crim. App. 1982) (citing Willocks v. State, 546 S.W.2d 819, 822 (Tenn. Crim. App. 1976)). As the United States Supreme Court has explained, because the use of physical restraints on defendants during trial is "an affront to the very dignity and decorum of judicial proceedings," restraints such as shackles may only be used as "a last resort." Illinois v. Allen, 397 U.S. 337, 344 (1970).

While we are mindful of the "legal presumption against the use of in-court restraints," Mobley, 397 S.W.3d at 101 (citing Willocks, 546 S.W.2d at 821), we also recognize that a decision regarding the use of shackles on a defendant is entrusted to the discretion of the trial court, id. at 99 (citing Willocks, 546 S.W.2d at 821-22). See also State v. Thompson, 832 S.W.2d 577, 581-82 (Tenn. Crim. App. 1991) ("Obviously, the allowance of shackles, approved in Willocks, indicates that the due process right involved is a qualified one which depends upon the circumstances of each case."). To guide the determination of whether the use of shackles may be appropriate, this Court has explained the balance between due process principles and a particularized need for restraints as follows:

Tennessee law, consistent with federal precedent, affords the trial court discretion with respect to the decision to employ shackles, but the State bears the burden of demonstrating necessity. As for those reasons supporting the use

of shackles, Tennessee law has recognized preventing the escape of the defendant, protecting individuals in the courtroom, and maintaining order during trial.

When requiring shackles, the trial court must place findings of necessity on the record. In fact, the better practice is to hold a hearing so that factual disputes may be resolved and evidence concerning the use of shackles may be placed in the record. The trial court must employ the least drastic security measure necessary to accomplish the objective. Lastly, in the event the defendant is shackled in view of the jury, the trial court must give a cautionary instruction that the shackling should not influence the jury's decision.

. . . .

. . . The trial court should consider all relevant circumstances, including without limitation: (1) the defendant's circumstances, such as record of past behavior, temperament, and the desperateness of his or her situation; (2) the state of the courtroom and courthouse; (3) the defendant's physical condition; and (4) whether there is a less onerous but adequate means of providing security. The trial court should consider the relevant circumstances against the backdrop of affording the defendant the physical indicia of innocence, ensuring the defendant's ability to communicate with counsel, protecting the defendant's ability to participate in his or her defense and offer testimony in his or her own behalf, and maintaining a dignified judicial process.

Mobley, 397 S.W.3d at 99-101 (citations omitted).

Applying these principles to the facts of this case, we are unable to conclude that the use of shackles in this instance was inappropriate. First, the record does not support the Defendant's contention that he was shackled during the guilt phase of the trial. On March 5, 1991, Judge Wallace entered a pre-trial order requiring that the Defendant and Quintero be given "street clothing or such clothing that does not demonstrate to the jury that they are prisoners" and that they "not be chained, handcuffed or restrained in the presence of the jury so long as they conduct themselves in such a manner consistent with an orderly trial in this cause." It does not appear that the shackling issue was mentioned again until December 2, 1991, when the following discussion took place immediately before the jury was brought into the courtroom to begin the penalty phase of the trial:

> [Defendant's counsel:]      Your Honor, . . . has it already been ruled that our clients will remain in shackles?

-32-

| | |
|---|---|
| The Court: | No. |
| [Defendant's counsel:] | I'd like to ask that they be removed. |
| The Court: | No. I don't think you can — you probably can't see them from the jury box . . . . |
| The Sheriff: | I went over there and checked and you can't see them from over there. |
| The Court: | Okay. I'll leave the leg irons on then, because they're under the table and they can't be seen from the jury box. |

. . . .

| | |
|---|---|
| [Quintero's counsel:] | For the record, Your Honor, we would like to state that Mr. Quintero is also in shackles. I didn't even notice, but just for the purpose of the record — |
| The Court: | Just the leg irons, and they're under the table. And the Sheriff has walked at every box in the jury and he can't see them, [they] cannot be seen. And the [S]heriff is responsible for security, and that's what he wants to do. I'm going to allow the leg shackles to remain. |
| | If some emergency arises, I'll excuse the jury and the jury won't ever see them. The jury can't see them from where they are now. Bring the jury back in. |

Moreover, the Defendant has not demonstrated that the use of shackles was an abuse of the trial court's discretion. In his brief to this Court, the Defendant devotes less than half a page to the shackling issue, asserting that he is entitled to a new trial simply because Skeleton saw him in shackles during the course of the trial. This argument, however, ignores the fact that the use of shackles on a defendant is not, in itself, sufficient to establish a due process violation. Rather, the physical indicia of innocence is a qualified right that depends upon the circumstances of each case.

-33-

Here, the Defendant and Quintero, who were on trial in the same rural courthouse at the same time, had committed multiple offenses following their joint escape from a Kentucky state prison. In addition to the escape in this case, Quintero had escaped from custody on two prior occasions. The Defendant had been convicted in Kentucky as a persistent felony offender. Charged with two counts of first degree felony murder, four counts of grand larceny, and three counts of first degree burglary, the Defendant was facing the possibility of another lengthy sentence in Tennessee. The record reflects that security was a specific concern at the jail and at the courthouse during the trial. Based on these facts, we conclude that the State made a specific showing of necessity for restraints, and, therefore, Judge Wallace did not abuse his discretion by permitting the use of shackles on the Defendant. See, e.g., State ex rel. Hall v. Meadows, 389 S.W.2d 256, 259-60 (Tenn. 1965) (allowing use of handcuffs on four-time escapee); Thompson, 832 S.W.2d at 582 (identifying security risk based on prior attempted escape); Rivera v. State, 443 S.W.2d 675, 679 (Tenn. Crim. App. 1969) (allowing use of handcuffs on two-time escapee).

Finally, the Defendant has not presented any evidence to support his claim that the use of shackles improperly influenced the jury during either the guilt or penalty phase of the trial. At the post-conviction hearing, only one juror testified that he had seen the Defendant in shackles as he was brought into the courtroom at some unspecified time "during the course of the trial." Officer Warren testified that although the Defendant was shackled and handcuffed during transportation to and from the courtroom each day, the handcuffs and leg shackles were removed before the jury entered the courtroom and were placed back onto the Defendant only after the jury had exited the courtroom. Further, the original trial record reveals that Judge Wallace took several precautions to ensure that the leg shackles were not visible to the jury during the penalty phase. In consequence, the Defendant is not entitled to relief on this issue.

### D. Sufficiency of the Evidence

As he did on the original direct appeal, the Defendant argues that the evidence at trial was insufficient to support his convictions. The Court of Criminal Appeals declined to address the sufficiency of the evidence in this delayed appeal, citing to the doctrine of "the law of the case," which typically precludes the reconsideration of issues already decided in prior appeals of the same case. State v. Jefferson, 31 S.W.3d 558, 560 (Tenn. 2000) (quoting Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd., 975 S.W.2d 303, 306 (Tenn. 1998)). The rationale behind the doctrine is that a ruling is binding on subsequent trials or appeals of the same case if the facts in the second trial or appeal are essentially the same as the facts in the initial trial or appeal. Memphis Publ'g Co., 975 S.W.2d at 306. Notwithstanding this general rule, however, courts may reconsider issues that have been previously determined if one of the following exceptions applies:

(1) the evidence offered at the [subsequent proceeding] was substantially different from the evidence at the first proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law occurring between the first and second [proceeding].

State v. Carter, 114 S.W.3d 895, 902 (Tenn. 2003) (citing Jefferson, 31 S.W.3d at 561).

While the doctrine of the law of the case can be a useful tool for the sake of judicial economy and consistency, the doctrine is neither a constitutional mandate nor a limitation on this Court's power. Memphis Publ'g Co., 975 S.W.2d at 306 (citing 5 Am. Jur. 2d Appellate Review § 605 (1995); Ladd ex rel. Ladd v. Honda Motor Co., 939 S.W.2d 83, 90 (Tenn. Ct. App. 1996)). "Rather, it is a longstanding discretionary rule of judicial practice . . . ." Id. (emphasis added) (citing Ladd, 939 S.W.2d at 90). In consequence, the doctrine is not a rule of law but is "merely a practice to guide the court[s]." State v. Scarbrough, No. E2003-02850-CCA-R9-CD, 2004 WL 2280423, at *4-5 (Tenn. Crim. App. Oct. 11, 2004) (quoting Brett T. Parks, *McDonald's Corp. v. Hawkins* and "The Law of the Case" Doctrine in Arkansas, 50 Ark. L. Rev. 127, 131 (1997)). In this instance, while we agree with the Court of Criminal Appeals that the circumstances do not qualify for review under any of the three exceptions to the doctrine of the law of the case, we have chosen to exercise our discretion to review the sufficiency of the evidence.[6] Although this issue was raised in the Defendant's original motion for new trial and was considered by the Court of Criminal Appeals on direct appeal, the Defendant was granted a delayed appeal in this capital case due to the obvious shortcomings of his counsel on the original direct appeal. Under these circumstances, the law of the case doctrine does not prohibit this Court from reconsidering the sufficiency of the evidence. See, e.g., State v. Harris, 919 S.W.2d 323, 334 (Tenn. 1996) (recognizing a "heightened regard for the imperatives of fundamental fairness and substantial justice" in capital case procedures because "death is different from all other penalties and . . . is severe beyond rectification").

Although the Defendant claims that the evidence at trial was insufficient because it was entirely circumstantial, the law governing the sufficiency of the evidence, in particular with regard to circumstantial evidence, has not changed in his favor since the prior rulings

---

[6] If we had determined that the Defendant presented newly discovered evidence in support of his petition for writ of error coram nobis, then the evidence offered upon remand for the delayed appeal would have been substantially different from the evidence presented at the original trial, and, therefore, the first exception to the doctrine would apply. Because, however, we have rejected the Defendant's alleged newly discovered evidence for its lack of credibility, this proof will not be considered as part of our sufficiency of the evidence analysis.

on this issue. On the original direct appeal, the Court of Criminal Appeals, in finding that the circumstantial evidence was sufficient to support the convictions, relied upon the law in effect at the time—that although a crime may be established by direct evidence, circumstantial evidence, or a combination of the two, a conviction based solely upon circumstantial evidence requires that the facts and circumstances be so strong and cogent as to exclude every other reasonable hypothesis except the guilt of the defendant, which must be established beyond a reasonable doubt. Hall, 1997 WL 92080, at *16 (citing State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Crawford, 470 S.W.2d 610, 612-13 (Tenn. 1971)). On further direct appeal, this Court affirmed. Hall, 976 S.W.2d at 123-24, 136. Now, in his brief to this Court on the delayed appeal, the Defendant continues to rely on case law requiring that circumstantial evidence "weave a web of guilt" that allows no other inference to be made by a reasonable jury. See, e.g., State v. Gilley, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008).

In 2011, however, this Court departed from the rationale of these prior decisions and adopted the federal standard for determining whether circumstantial evidence is sufficient to support a conviction, holding that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011); see also State v. Adams, 405 S.W.3d 641, 662 (Tenn. 2013) ("In Dorantes, this Court abolished any distinction between the standard of proof required at trial in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State."). In consequence, when the sufficiency of the evidence is challenged on appeal, the relevant question is simply whether, after reviewing the evidence—direct, circumstantial, or both—in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). Although we review de novo the application of the law to the facts, Jordan v. Knox Cnty., 213 S.W.3d 751, 763 (Tenn. 2007) (citing State v. Thacker, 164 S.W.3d 208, 247-48 (Tenn. 2005)), we cannot substitute our own inferences for those drawn by the factfinders at trial, State v. Lewter, 313 S.W.3d 745, 747-48 (Tenn. 2010). With these standards in mind, we now turn to review the evidence in support of the Defendant's convictions.

The Defendant was found guilty of two counts of first degree felony murder, which the trial court defined for the jury as "kill[ing] any person during the perpetration of, or attempt to perpetrate[,] any first degree burglary." This offense required the State to prove that the Defendant unlawfully killed Myrtle and Buford Vester during the perpetration of or

attempt to perpetrate a first degree burglary, and that the Defendant specifically intended to commit the first degree burglary. As charged by the trial court in relation to the Vester, Cherry, and Foster residences, the offense of first degree burglary required the State to prove that the Defendant "did break and enter the alleged dwelling place . . . with the intent to commit the felony of larceny therein[,] . . . that the structure was occupied permanently or temporarily as a dwelling[,] . . . and . . . that the offense occurred during the nighttime." As to the related four larceny convictions based on items taken from the Vester, Cherry, and Foster residences, the offense of grand larceny required the State to prove that the Defendant took personal goods of a victim without the victim's consent, that the Defendant carried away the personal goods with the intent to permanently deprive the victim of the goods, and that the goods were valued at more than two hundred dollars. The lesser included offense of petit larceny required the State to prove the same elements except that a petit larceny conviction required the goods to be valued at two hundred dollars or less.

The State's theory at trial was that all of these crimes were intertwined, occurring at various residences within the Leatherwood community in Stewart County over a period of four or five days following the Defendant's prison escape from nearby Eddyville, Kentucky on June 16, 1988. Although fellow inmates Sherman, Spurling, and Cook were captured in the vicinity of the prison within two days of their escape, the Defendant, Quintero, Blanton, Montgomery, and Hudson were able to avoid the authorities. Pallay, who was acquainted with Quintero and knew that he was familiar with the Leatherwood area, notified the Stewart County Sheriff's Department that Quintero might seek refuge there. The police also received reports from other sources that suspicious individuals were in the area following the prison escape. At one point, the police spotted and chased some unidentified men in the woods but were unable to overtake them.

Between June 18 and 21, 1988, seven Leatherwood residences were broken into: the residences of Jim McMinn, Essie Settles, Alfred Cherry, Thomas Harris, Neal Foster, John and Virginia Crawford, and Myrtle and Buford Vester. While the Defendant's various convictions related to events occurring at the Vester, Cherry, and Foster residences, the evidence also established his presence at the Harris and Crawford residences. Knives, paperweights, and other items were taken from the Cherry residence, some of which were later found at the Foster residence and inside the stolen truck that was used in the escape from Kentucky. Five long-distance telephone calls were made from the Harris residence—three calls to Quintero's brother in Texas and two calls to the Defendant's girlfriend in Pennsylvania. Guns, ammunition, silver dollars, and other items were taken from the Foster residence, where the Defendant's fingerprint was found on a soft drink can. The Defendant's thumbprint was also found on a can of ham inside the Crawford residence. A glove taken from the Crawford residence matched a glove found outside of the Vester residence.

On June 20, 1988, two fishermen heard five gunshots between 11:00 p.m. and midnight, all coming from the direction of the Vester residence. On June 22, the bodies of Myrtle and Buford Vester were discovered inside their residence. Both victims had been shot at least once from the outside of the residence and had been shot a total of five times with three different weapons. The police determined that the perpetrators had gained entry through a window in the back bedroom. Broken shards of glass and spent shotgun shells were found throughout the interior of the residence. The Vesters' 1985 Pontiac was missing, as were several packages of Pepsi. When the Vesters' Pontiac was later discovered at the funeral home in Memphis, it contained a shotgun and ammunition that had been taken from the Foster residence, a flashlight that had been taken from the Crawford residence, and the Pepsi packages that had been taken from the Vester residence. Employees of the funeral home testified that three men exited the Pontiac and abandoned the vehicle. Soon thereafter, three men, later identified as Blanton, Quintero, and the Defendant, were spotted at the Greyhound bus station in Memphis. Two other witnesses identified Blanton, Quintero, and the Defendant as the three men who traded silver dollars for services at the Blue Movies West in Memphis and tried to pawn several other items. Foster was later able to identify the silver dollars as those taken from his residence.

Taken in the light most favorable to the State, all of this evidence, although primarily circumstantial, was sufficient for a rational juror to have found the essential elements of each of the crimes beyond a reasonable doubt. The proof at trial established that the Defendant participated in the string of break-ins occurring within and around the Leatherwood community in the days immediately following his escape from prison. As to the larceny convictions, numerous items of value were taken from the Vester, Cherry, and Foster residences, some of which were recovered in other locations and others that were never recovered, clearly indicating an intent to permanently deprive the victims of their property. On the direct appeal, the Court of Criminal Appeals properly merged the dual larceny convictions for items taken from the Vester residence. As to the burglary convictions, the evidence demonstrated that the residences were broken into and that larcenies were committed therein. The fact that some of the victims were not at home and that some of the residences were seasonal or temporary does not preclude a conviction for burglary. Although the exact time of each burglary could not be determined—other than the crimes that took place at the Vester residence between 11:00 p.m. and midnight on June 20—there was sufficient evidence for the jury to conclude that each of the burglaries occurred "during the nighttime" at some point over the course of several days immediately following the Defendant's escape from prison. Finally, as to the felony murder convictions, it is undisputed that Myrtle and Buford Vester died as a result of their injuries, which were inflicted during the course of a first degree burglary in which the Defendant participated. In summary, the Defendant has failed to show that the evidence at trial was legally insufficient to sustain the guilty verdicts.

### E. Capital Sentencing in Tennessee

As for the Defendant's claims that our capital sentencing scheme is unconstitutional and is substantively and procedurally inadequate, this Court has repeatedly and consistently rejected the various arguments raised by the Defendant. See, e.g., State v. Pruitt, 415 S.W.3d 180, 222-23 (Tenn. 2013). Specifically as to the Defendant's sentence of death, this Court previously conducted its statutorily mandated review in the original direct appeal, and the sentence of death was affirmed. Hall, 976 S.W.2d at 135-39. The Defendant has not presented any new arguments to challenge the propriety of his death sentence, and, therefore, we need not revisit the issue in this delayed appeal.

### IV. Conclusion

After careful review, we conclude that the Defendant is not entitled to a new trial or a writ of error coram nobis. The judgment of the Court of Criminal Appeals is, therefore, affirmed. The post-conviction proceedings that were held in abeyance pending resolution of this appeal will be resumed by order of this Court in the case styled Quintero v. State, No. M2005-02959-SC-R11-PD, and the Defendant will be permitted to amend his post-conviction petition to assert any new claims of ineffective assistance of counsel as a result of the handling of the delayed appeal. It appearing that the Defendant is indigent, costs of this delayed appeal are taxed to the State of Tennessee.

_____
GARY R. WADE, JUSTICE

-39-