IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 4, 2018

**CHRIS JONES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 08-05720      Chris Craft, Judge**

_____

**No. W2017-00706-CCA-R3-ECN**

_____

Pro se Petitioner, Chris Jones, appeals the Shelby County Criminal Court's dismissal of his petition for writ of error coram nobis. The Petitioner concedes that his petition was filed nearly seven years beyond the one-year statute of limitations and argues that due process consideration warrants tolling of the limitations period. Upon review, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Chris Jones, pro se, Nashville, Tennessee.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Karen Cook, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In the early morning hours of March 14, 2008, the Petitioner was involved in an altercation at a bar in Memphis, which led to him shooting two bar patrons and the death of Donald Munsey. The facts, as fully outlined in this court's direct appeal opinion, stem from a parking dispute.

> Justin Smith testified that he was sitting in his truck when the [Petitioner's] truck "[j]ust came flying in around the corner ... [and] almost hit [his] truck in parking." Mr. Smith further testified that he felt he would not be able to get his truck out of the parking spot because of the way the [Petitioner] had parked his truck. However, Mr. Smith waited until the

[Petitioner] had gone inside the bar to speak to him about his truck. Once inside, the [Petitioner] sat down with Ms. Lampley and Mary at a table near the front door and ordered a beer. Mr. Smith then approached the [Petitioner] to discuss how the two trucks were parked. The testimony at trial presented several conflicting versions of exactly what was said during this conversation.

Kimberly Guest, the waitress working at Windjammer that night, testified that Mr. Smith asked the [Petitioner] if it was his truck outside and "if he could possibly move it because ... the trucks were close and [he] didn't want to hit his truck." Ms. Guest testified that "there was no indication that there was any kind of problem," there was no physical contact between the two men, and she did not hear any "threatening language." Stephanie Ravinuthala, a patron at the bar that night, testified that Mr. Smith asked the [Petitioner] if he drove a gray truck and told the [Petitioner] that he was "parked like three inches from [Mr. Smith's] bumper and [Mr. Smith could not] get out." Ms. Ravinuthala also testified that Mr. Smith did not appear to be belligerent and that she did not recall Mr. Smith cursing at the [Petitioner].

Mr. Smith testified that when he asked the [Petitioner] to move his truck, the [Petitioner] responded by saying "f—k you . . . I'm not moving it." On cross-examination, Mr. Smith repeatedly denied threatening or being aggressive with the [Petitioner] but admitted that after the [Petitioner] told him "f—k you," he was "rude" toward the [Petitioner]. However, Ms. Lampley testified that Mr. Smith approached the [Petitioner] intoxicated, "very loud, very arrogant" before asking the [Petitioner] "if that was his f_____g truck outside." Ms. Lampley testified that the [Petitioner] was very calm during this exchange and told Mr. Smith he would move his truck when Mr. Smith was ready to leave.

At some point after their conversation, both Mr. Smith and the Defendant went outside. Gary Miller was working at the front door, checking IDs, that night and testified that he overheard the two men "discussing the way the [trucks] were parked." Mr. Miller also testified that at some point two or three other men joined the conversation. According to Mr. Miller, the [Petitioner] asked the men "did they not realize that he was a police officer by the tag that was on the truck." Mr. Miller further testified that there was no physical contact between the [Petitioner] and any of the three or four people with him. Mr. Smith testified that he went outside with the [Petitioner] because the [Petitioner]

"wanted to show me his license plate." The [Petitioner] told Mr. Smith that "he was a cop and he had the tag on his truck." Mr. Smith testified that after their conversation outside, he did not speak to the [Petitioner] again that evening.

Mr. Smith's friend, William Bobbitt, testified that he was near the front door when Mr. Smith and the [Petitioner] went to look at the trucks. On their way back to the front door, Mr. Bobbitt overheard the [Petitioner] say that he was not going to move his truck and that Mr. Smith should look at his license plate. Someone asked the [Petitioner] what he meant by this, and he replied that he was a police officer. Mr. Bobbitt testified that the [Petitioner] spoke with an aggressive tone but that there was no physical contact between the [Petitioner] and anyone outside. Mr. Bobbitt further testified that everyone went back inside after Mr. Munsey stepped outside and told them to come in.

Ms. Lampley testified that before the [Petitioner] and Mr. Smith went outside, Mr. Smith made a phone call and a short time later "[a]bout [ten] guys around the age of 21 to 25 showed up" and were looking at the [Petitioner]. Ms. Lampley testified that the [Petitioner] looked scared when he came back inside. Ms. Lampley testified that she felt threatened because this group of men continued to stare at the [Petitioner] and her. However, on cross[-]examination Ms. Lampley admitted that she was "making some jump here ... that Mr. Smith called people and that as a result of those calls, people arrived."

. . . .

After the [Petitioner] reentered the bar, David Eagan approached him to discuss the parking situation . . . . Mr. Eagan testified that he "asked [the Petitioner] to move his truck and . . . just to calm down and everything was going to be okay. . . ."

Several witnesses saw the confrontation between the [Petitioner] and Mr. Eagan inside the bar. Ms. Ravinuthala testified that she saw Mr. Eagan "lean[ ] down into [the Petitioner's] face" when he spoke to him and that the Petitioner responded by standing up and getting in Mr. Eagan's face. Joe Reynolds was working at the bar that night and testified that he saw the [Petitioner] and Mr. Eagan "talking about the parking place or something." Mr. Reynolds testified that the [Petitioner] had an ink pen in his hand and

- 3 -

was "gripping [it] so tight that his knuckles were white." Mr. Reynolds decided to get Mr. Eagan to move away from the [Petitioner]. . . .

. . . .

Mr. Reynolds approached the [Petitioner] and had a second conversation with him as the [Petitioner] stared at Mr. Eagan and Mr. Smith. Mr. Reynolds asked the [Petitioner] if he was okay, and the [Petitioner] pointed at Mr. Eagan and said, "I'm going to kill that motherf____r right there." Then the [Petitioner] pointed at Mr. Smith and said, "I'm fixing to kill his punk ass buddy and if any of his buddies over there even approach me, I'm going to kill all of them motherf____s." Mr. Reynolds told the [Petitioner] to calm down, and the [Petitioner] responded by saying, "I've lost my wife and I've lost my family and I've lost my home and I got nothing else to lose." Ms. Flynn and Ms. Ravinuthala both overheard the [Petitioner] threaten to kill Mr. Smith and Mr. Eagan. Mr. Flynn overheard the [Petitioner] say he had nothing left to lose. Ms. Flynn testified that the [Petitioner] was clenching and unclenching his fists as he spoke with Mr. Reynolds. Mr. Flynn also testified that the [Petitioner] seemed very upset as he spoke with Mr. Reynolds. Mr. Reynolds again told the [Petitioner] to calm down but was called away to the office to answer a telephone call.

. . . .

After Mr. Reynolds left the [Petitioner], Mr. Eagan paid his bar tab and began to walk toward the door. [footnote omitted]. The [Petitioner] pulled out a gun, ran toward Mr. Eagan, grabbed Mr. Eagan by his shirt collar, and put a gun to his head. Mr. Eagan testified that the [Petitioner] said, "I'm going to kill you. I have nothing to lose."

The testimony at trial presented conflicting accounts of what happened next. Mr. Flynn testified that the bar was crowded that night and there were lots of people standing near the [Petitioner] and Mr. Eagan. Ms. Guest testified that she was near the [Petitioner] and overheard him say, "who's the tough guy now, motherf____r . . . the tough guy's got the gun." Ms. Guest further testified that she asked the [Petitioner] "please don't do this" when Mr. Munsey grabbed the [Petitioner] from behind. According to Ms. Guest, Mr. Eagan then fainted, knocking down the [Petitioner], Mr. Munsey, and Ms. Guest as he fell to the floor. Ms. Guest then heard two or three gunshots and saw that Mr. Munsey had been shot in the neck.

- 4 -

Mr. Bobbitt testified that he and Mr. Munsey were in the kitchen when they saw the [Petitioner] grab Mr. Eagan. Mr. Bobbitt also testified that he did not see a gun from where they were standing. Mr. Bobbitt and Mr. Munsey then charged toward the [Petitioner] and tackled him. All four men fell to the ground; however, Mr. Bobbitt testified that while the men were on the ground, no one hit the [Petitioner]. Mr. Bobbitt also testified that Ms. Guest was not involved at all. Mr. Bobbitt then heard two gunshots and ran out of the building. Mr. Smith similarly testified that Mr. Bobbitt and Mr. Munsey tackled the [Petitioner]. After hearing the first gunshot, Mr. Smith ran out the front door, and out of the corner of his eye, he saw the [Petitioner] aiming the gun at him. Mr. Smith was then shot in the buttock. Mr. Eagan testified that he did not remember anything after he fell to the ground.

Mr. Flynn and Ms. Ravinuthala both testified that they saw Mr. Munsey tackle the [Petitioner] and that both men and Mr. Eagan fell to the floor. Ms. Ravinuthala testified that she saw the [Petitioner] and Mr. Munsey "wrestle" on the ground for a minute. The [Petitioner] then pulled himself up, aimed his gun at Mr. Munsey's head, and fired it. Next, the [Petitioner] turned and aimed his gun at Mr. Smith before firing a second time. Mr. Miller had left the bar earlier to run an errand, and when he returned, he discovered Mr. Munsey's body lying on the floor with Ms. Guest kneeling next to him. Mr. Miller saw the [Petitioner] seated by the front door. He told the [Petitioner] to remove the magazine from his gun and to lay them on a table, and the [Petitioner] complied.

State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *1-5 (Tenn. Crim. App. Mar. 9, 2011) perm. app. denied (Tenn. August 25, 2011).

Although the Petitioner testified at trial, the jury rejected his theory of self-defense and convicted him of second degree murder (David Munsey victim), attempted second degree murder (Justin Smith victim), attempted voluntary manslaughter (David Eagan victim), possession of a firearm where alcoholic beverages are served, and use of a firearm during the commission of a dangerous felony. He received an effective 26-year sentence. Chris Jones, 2011 WL 856375 at *7. We affirmed his convictions on direct appeal, and our supreme court denied his application to appeal on August 25, 2011. Id.

On February 5, 2017, the Petitioner filed the instant petition for writ of error coram nobis based on "actual innocence" and "newly discovered evidence." Although the Petitioner conceded that his petition was untimely, he argued that the statute of limitations should be tolled because the State withheld exculpatory evidence, his trial and

appellate counsel retained the trial transcript, and he was unable to review the transcript until January 9, 2015. After comparing certain portions of the trial transcript and a civil deposition of the owner of the bar, the Petitioner opines that there was another gun involved in the shooting at the bar. He further opines that this would have changed the outcome of his trial because it would have corroborated his theory of self-defense.

In a February 28, 2017 written order, the coram nobis court denied relief on several grounds.[1] First, it reasoned that the petition was time-barred based on the August 14, 2009 denial of the Petitioner's motion for new trial, which meant that the petition was filed more than six years after the statute of limitations had expired. Next, the court determined that the Petitioner was not entitled to due process tolling because he was present during the trial and heard the testimony he relied upon in the trial transcript; therefore, it did not constitute newly discovered evidence. Additionally, the court found that, even if the evidence in the trial transcript constituted newly discovered evidence, the Petitioner had access to this evidence in January of 2015 and waited to file the writ of error coram nobis until two years after receiving the transcripts. Finally, the court reasoned that, even if it tolled the limitations period, the grounds relied upon by the Petitioner established a new legal theory rather than the Petitioner's actual innocence as required by law. It is from this order that the Petitioner now appeals.

## ANALYSIS

The Petitioner contends that the coram nobis court erred by summarily dismissing his petition for coram nobis relief without considering the newly discovered evidence, specifically the officer's statements at trial regarding the number of bullets found in the gun, the number of spent shell casings found at the crime scene, and the maximum capacity of his gun; the bar owner's deposition testimony revealing the existence of a second gun; and the lack of ballistic evidence linking the Petitioner's gun to the spent shell casings, that would have materially affected the outcome of his trial. The State maintains that the petition was filed beyond the statute of limitations and that the Petitioner has failed to show that due process requires tolling the statute of limitations. We agree with the State.

A petition for writ of error coram nobis is available to criminal defendants based on subsequently or newly discovered evidence. Tenn. Code Ann. § 40-26-105(a), (b). These claims are subject to a one-year statute of limitations. Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010). The statute of limitations is computed from the date the judgment

---

[1] The trial court's order states that this matter was "heard," however, the record on appeal does not contain a transcript of a hearing on this matter. Accordingly, we will characterize this matter as summary dismissal of the Petitioner's coram nobis petition.

of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion. Id. Coram nobis petitions are governed by Tennessee Code Annotated section 40-26-105(b), which provides:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Id. § 40-26-105(b); Wlodarz v. State, 361 S.W.3d 490, 499 (Tenn. 2012) abrogated on other grounds by Frazier v. State, 495 S.W.3d 246 (Tenn. 2016). To seek coram nobis relief, the petitioner must establish that he or she was "'without fault' in failing to present the evidence at the proper time." Harris, 102 S.W.3d at 592-93. A petitioner is "without fault" if he or she is able to show that "the exercise of reasonable diligence would not have led to a timely discovery of the new information." State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007). The decision to grant or deny a petition for the writ of error coram nobis rests within the sound discretion of the trial court, which this court reviews for an abuse of discretion. State v. Hall, 461 S.W.3d 469, 496 (Tenn. 2015) (citing Harris, 301 S.W.3d at 144).

It is undisputed that the Petitioner filed his coram nobis petition more than one year after the judgment of conviction became final as required by law. The record shows that the Petitioner's judgment became final on August 14, 2009, when the trial court denied his motion for new trial. Accordingly, the statute of limitations expired on August 14, 2010, and the Petitioner did not file a petition for writ of error coram nobis until February 6, 2017, nearly seven years after the limitations period expired.

We must now consider whether the Petitioner has established due process concerns which require tolling of the statute of limitation. Workman v. State, 41 S.W.3d 100, 101-102 (Tenn. 2001). In doing so, we are mindful that due process requires the tolling of a statute of limitations period when a petitioner would otherwise be denied "'an opportunity for the presentation of claims at a meaningful time and in a meaningful manner.'" Id. at 102 (quoting Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992)). In determining whether due process requires tolling of the statute of limitations, this court must weigh the Petitioner's interest in obtaining a hearing on the grounds of newly

discovered evidence against the State's interest in preventing stale and groundless claims. Harris, 301 S.W.3d at 145 (citing Workman, 41 S.W.3d at 103). To balance these interests, we use the following three-step analysis:

> (1) determine when the limitations period would normally have begun to run;
>
> (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and
>
> (3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Wilson, 367 S.W.3d at 234 (quoting Sands, 903 S.W.2d at 301).

We have already determined that the limitations period began to run on August 4, 2009. Next, we must determine whether the Petitioner's grounds for relief actually arose after the limitations period normally would have commenced. In the pro se petition, the Petitioner identifies three pieces of allegedly "newly discovered evidence" forming the basis of his due process claim: (1) officers' statements made at trial regarding the number of live rounds left in the Petitioner's gun and the number of shell casings at the scene; (2) a deposition of the bar owner from a civil trial against the Petitioner referencing the presence of a second gun inside the bar; and (3) the lack of a ballistic test. In regard to the officers' statements, we agree with the coram nobis court, and conclude that the Petitioner was present at the trial and therefore privy to the officers' testimony. As we understand the import of the petition, the Petitioner contrasts the officers' testimony at trial with a transcript from a deposition of the bar owner where the crime occurred and opines that there was another gun and/or shooter responsible for the offense. The Petitioner then emphasizes the failure of the police to conduct ballistic testing as additional corroboration that he was framed. Simply put, this does not constitute newly discovered evidence but rather a new legal theory, which is not grounds for coram nobis relief.

We conclude that the alleged grounds for relief did not arise after the commencement of the limitations period. Given that the grounds enumerated by the Petitioner were not later-arising, a strict application of the limitations period would not effectively deny the Petitioner a reasonable opportunity to present this claim. Therefore, the Petitioner's claims do not require equitable tolling. The coram nobis court did not abuse its discretion, and the Petitioner is not entitled to relief.

**CONCLUSION**

The judgment of the coram nobis court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE