FILED

02/08/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 17, 2019

**STATE OF TENNESSEE v. CREED GETTYS WELCH**

**Appeal from the Circuit Court for Lawrence County**
**No. 32586     Stella L. Hargrove, Judge**

_____

**No. M2016-01335-CCA-R3-CD**

_____

Defendant, Creed Gettys Welch, was convicted after a jury trial of one count of aggravated sexual battery of a victim less than thirteen years of age and was sentenced to serve ten years at 100%. On appeal, Defendant challenges the sufficiency of the evidence supporting the conviction and the trial court's alleged failure to fulfill its role as the thirteenth juror. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT L. HOLLOWAY, JR., JJ., joined.

Amy L. Schisler (at trial), Waynesboro, Tennessee, and Kevin S. Latta (on appeal), Columbia, Tennessee, for the appellant, Creed Gettys Welch.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Brent A. Cooper, District Attorney General; and Christi Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant was indicted by the Lawrence County Grand Jury in June of 2014 for one count of aggravated sexual battery of a victim less than thirteen years of age occurring on or about May 5, 2014, in violation of Tennessee Code Annotated section 39-13-504.

At the time of the events that gave rise to the indictment, the victim, E.G.,[1] was three years of age. The victim lived in Lawrence County with her parents and siblings but often spent time at her grandmother's house in Summertown, Tennessee. The victim's grandmother, D.B., met Defendant online and started a romantic relationship with him in "August or September" of "the year before" the incident. After dating for a few months, Defendant moved from Knoxville to Summertown to live with D.B. He moved in to the house prior to Christmas, approximately in December. Defendant was helpful around the house and the yard; he cooked meals and the couple went shopping together. Defendant helped with the bills and helped buy groceries. D.B. felt like the two "had a really good relationship." The couple had talked of marriage.

On the day of the incident in early May of 2015, D.B. had the day off from work. Her daughter brought the victim to stay with D.B. for the day. The victim called D.B. "Nanny." Defendant was also at the house that day along with a small dog, which D.B. recalled was named Gracie. According to D.B., "it was kind of in the springtime, so it was damp and cool early in the morning." Because of the weather, all three of them ate breakfast and stayed inside during the morning. D.B. planned to spend time in the yard "picking up limbs" and spraying the yard for ticks once it warmed up that day. D.B. explained that she had a swimming pool in the back yard and that she was careful to make sure someone was with the victim at all times while they were outside. Once it warmed up outside, D.B., Defendant, and the victim went outside to work in the yard, picking up sticks and cleaning up the yard. After working in the yard for a bit, the victim got thirsty. D.B. suggested that Defendant "take [the victim] out there . . . on the front porch" so that D.B. could spray the yard for ticks. D.B. planned to fix the victim a drink when she came inside from working in the yard. D.B. estimated that she was outside for an additional fifteen to twenty minutes after Defendant and the victim went to the front porch before the "sprayer messed up." D.B. decided to take a break from yardwork. She entered the house through the back door, walked into the kitchen and fixed the victim a drink.

The house was situated so that a person could be standing in the kitchen and see the front porch through the dining room windows. There was furniture on the front porch, including a porch swing, a settee, and a table. In the dining room area, the "front windows face[d] [the] front porch." The settee was located directly in front of the dining room window. The front windows were raised that day because it was warm outside. D.B. "could hear [Defendant talking] when [she] walked through the kitchen making [the victim] a drink." D.B. carried the drink toward the front door. When she "got right to the window, [she] stopped because [the victim] was talking but she was - - [Defendant] was

———————————

[1] It is the policy of this Court to refer to minor victims of sexual abuse by their initials. In this case, we will also refer to the close relatives of the victim by their initials, in order to protect the victim's identity.

sitting in the settee and [the victim] was right hunkered down in front of him." The victim was "sitting right at his straddle." D.B. could not see Defendant touching the victim. From her perspective, it looked like Defendant had one of his hands to his side, near the location of an ashtray on a table next to the settee. D.B. saw the victim stand up. The victim was pointing at something and talking to Defendant. D.B. said that the victim "had her hands going."[2] She heard the victim say, "Peepee," which is the word she used to refer to a private part. The victim "pointed to herself and then she went down." D.B. sat the drink down and walked straight through the dining room. When she got to the front door, the victim was "still hunkered down and her face was right in [Defendant's] straddle." D.B. opened the front door. The front door rattled as it opened and Defendant reacted to the noise by reaching out and grabbing the victim by her shoulders, bringing her to a standing position.

D.B. asked the victim to come inside to get her drink. Once the victim got inside the house, D.B. asked her if she and Defendant were "playing a game." The victim told her they were either playing "kissy peepee" or "kiss his peepee." D.B. explained that she was unsure exactly what the victim said because the victim was young and it was somewhat hard to understand everything that she said.

D.B. wanted the victim to remain calm so she told the victim that they were going to play a game. She took the victim to the car and asked her to be very quiet. However, once they got in the car, D.B. realized that her keys were not in the car. D.B. walked back into the house to get her keys and told Defendant he had ten minutes to leave. When D.B. retrieved her keys, she also took Defendant's cell phone in order to prevent him from calling anyone. Defendant told her she did not "understand" what was going on between the victim and Defendant on the front porch. D.B. got back into the car with the victim and took the victim to her mother's place of employment, about five or six minutes away. She told the victim's mother to take the victim to the doctor to have her examined.

D.B. went back to her house after dropping the victim off with her mother. Defendant was still at the house but had already loaded up most of his things. She asked him, "Is this why you don't have anything to do with your family? Is this something that's been happening?" Defendant said, "No." He told D.B. that he was "sick." D.B. was aware that Defendant suffered from diabetes and high blood pressure but told Defendant that this was "totally different than any of that." D.B. called the police.

D.B. acknowledged that the victim and Defendant spent time together when the victim was at her house and that the victim adored Defendant. She also admitted on cross-examination that Defendant had probably assisted the victim while using the

---

[2] It is unclear from the record what exactly D.B. meant by this statement.

bathroom. D.B. explained that the victim was three years old and consistently needed help when using the restroom.

The five-year-old victim testified. She was in kindergarten by the time of trial. She recalled going to "Nanny's" house to visit while Defendant was living with D.B. The victim testified that Defendant "was living at [her] nanny's, and [she] was there, and [Defendant] kissed [her] on the private." She further explained that on the day of the incident, she had her clothes on when Defendant "kissed [her] on the private, and he got a stick, and he put it to [her] throat." According to the victim, this occurred "outside on the swing" on the front porch, and Defendant did not say anything during the incident. On cross-examination the victim explained that she "was playing at [her] nanny's. And I knew [Defendant] was outside when she was inside, and [Defendant] came outside. And [she] was sitting in his lap, and he told me to get up, and he kissed me on the private, and he stuck a stick in [her] throat." According to the victim, "he stopped and [she] went . . . inside to tell nanny." The victim testified that her mother came to get her, and she was crying because she "was scared that [she] would get - - get in trouble."

The victim did not remember going to the doctor in Nashville. However, the victim was examined by Sue Ross, a pediatric nurse practitioner at Our Kid's Center in Nashville. Our Kid's Center was established as an outpatient facility of Nashville General Hospital to perform medical evaluation on children after allegations of sexual abuse. Ms. Ross was certified by the trial court as an expert in the area of forensic evaluation and medical examination of child sex abuse victims. Ms. Ross performed an evaluation of the victim on May 5, 2014, about one month prior to the victim's fourth birthday. The mother provided the victim's medical history and the information about the alleged incident was provided by both the mother and D.B. At the time of the exam, Ms. Ross knew that "potentially there was digital genital contact and this child had played the kissing game." Ms. Ross's report indicated that the victim "reportedly told her mother that [Defendant's] peepee would try to come out of his pants and that he touched her with his fingers, but did not distinguish where she had been touched."

At the conclusion of the exam, when the victim was "off the exam table and dressed," the victim "out of the blue" told Ms. Ross, "He kissed me here," and pointed to her genital area. Ms. Ross asked the victim to repeat herself. The victim repeated the statement. Ms. Ross asked the victim if her pants were up or down when this occurred, and the victim stated that her pants were down. In response to her spontaneous statement, Ms. Ross put the victim back on the exam table and took swabs for a rape kit. The lab results were negative.

Defendant was apprehended in Knoxville, Tennessee, on May 8, 2014. He was taken back to Lawrence County by local authorities.

At the conclusion of the State's proof, the State elected for the jury to consider the "incident described by [the victim] occurring on the front porch of her grandmother's home" to support the conviction for aggravated sexual battery.

Defendant testified that he was sixty-four at the time of trial. He met D.B. in 2013 while he was living in Knoxville. After dating D.B. for a few months, he moved in to her home. He recalled that he talked to D.B. about moving back to Knoxville a few weeks prior to the date of the alleged incident. His sister had cancer, and he "didn't want her to go through it alone." He had not "decided that [he]was going to necessarily leave that - - that particular day." He thought that he and D.B. had a good relationship but acknowledged that his decision to move back to Knoxville was influenced by his disabilities, including diabetes as well as an infection that would not go away.

On the day of the alleged incident, they were "basically at home" and spent the day "doing some work outside" like "hauling rubbish away" and "cutting a little bit of grass up around the fire-pit." Defendant got help from the victim, who was at the house "because her mom was working." Defendant explained that the victim "liked to follow [him] around." At one point that day, Defendant "hauled some things up to the shed" in his vehicle. He let the victim "drive" by standing in front of him and placing her hands on the steering wheel. When D.B. started spraying insecticide on the yard, he took the victim back to the house. He thought they got something to drink before going to the front porch to sit on the swing. Defendant recalled the victim "running around playing" when a dog named Colt[3] came around. He explained that the dog was lying down under the swing and the victim was "down in the floor under the swing." According to Defendant, the victim could be "a little bit rough" with the dog. The dog growled, so Defendant asked the victim to get up from under the swing. Defendant thought it was a good time to talk to the victim about the fact that he might move back to Knoxville. At that point, the victim was "on her knees sitting in front of [Defendant]" with "both hands" on his knees. The victim told Defendant that she did not want him to move. Defendant explained to the victim that he wanted to take care of his sister. Then, the victim told him that she had to go "peepee." About that same time, D.B. came outside and took the victim in the house. Defendant described her as "a little on the upset side," and claimed she "said a couple of things" that he did not really understand.

When D.B. came back outside, she started asking Defendant questions about what he had done with the victim. He did not understand what she was talking about. The next thing Defendant knew, D.B. and the victim were in a car driving away. When they left, Defendant started to pack up some things and left for Knoxville.

---

[3] The victim testified that D.B. did not have a dog named Colt.

Once he arrived in Knoxville, he found an apartment near his sister. Several days later, he was at the apartment waiting on furniture to be delivered when police officers showed up to his door and took him to the Knoxville police station. When he got to the police station, he was questioned by officers. He did not know why he was taken to the police station until officers "hinted around that it was a sexual situation." He was "flabbergasted" by the allegations and terminated the questioning. At trial, Defendant explained that he "did not touch her."

Defendant signed a *Miranda* form at the Knoxville police station and was arrested on May 8. Then officers brought him from Knoxville to Lawrence County where he was interviewed again.[4] According to Defendant, he explained during the interview that he was diabetic and had memory issues. Defendant blamed the memory issues on a "blood sugar crash."

On cross-examination, Defendant explained that there was no sense of "urgency to leave" the house that day, but that it was "a[s] good of time [as] any to move back to Knoxville, to go ahead and leave." He denied telling D.B. that he was "sick," explaining that he was referring to his sister. Defendant claimed that the reason for his move back to Knoxville had been "taken and twisted." Defendant explained that the victim "was not kneeling between [his] legs," but she was playing under the swing with a dog.

At the conclusion of the proof, the jury found Defendant guilty of aggravated sexual battery. After a sentencing hearing, the trial court sentenced Defendant to a ten-year sentence, to be served at 100% pursuant to Tennessee Code Annotated section 40-35-501(i). Defendant filed a timely motion for new trial. The trial court denied the motion. On appeal, Defendant challenges the sufficiency of the evidence and the trial court's failure to perform its role as thirteenth juror.

*Analysis*

On appeal, Defendant argues that "no reasonable juror, after hearing three distinctly differing versions of the events alleged . . . could arrive at a moral certainty as to guilt." The State disagrees.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any

---

[4] There is not a transcript or video of the interview in the technical record.

rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). "In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973)). We may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In order to be convicted of aggravated sexual battery, the State had to prove that there was unlawful sexual contact between Defendant and the victim, who was less than thirteen years of age. T.C.A. § 39-13-504(a)(4). "Sexual contact" means the intentional touching of anyone's intimate parts—or the clothing covering those parts—if the touching can be "reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). The "primary genital area" is considered an "intimate part." T.C.A. 39-13-501(2).

We conclude that the evidence is sufficient to support Defendant's conviction for aggravated sexual battery. The evidence at trial, viewed in a light most favorable to the State, established that the victim was well under thirteen years of age at the time of the incident. The victim testified that Defendant "kissed" her private parts on the porch at her "Nanny's" house. The victim provided details about the nature of the incident, the sequence of events, and the type of action that took place. D.B. testified that the victim told her that she and Defendant were playing a game, called "kissy peepee" or "kiss his peepee." Despite Defendant's testimony that nothing happened, the jury heard the testimony of both the victim and Defendant and assessed the credibility of the witnesses. The jury's verdict indicates that it credited the victim's testimony. The victim's testimony alone is sufficient to support Defendant's conviction. *See State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (stating that a child victim's testimony regarding sexual contact can be sufficient to support a conviction). Likewise, we conclude that the evidence regarding this incident was sufficient to support the State's election of the offense. Further, whether Defendant touched the victim over her clothes for the purpose

of sexual arousal or gratification was a question of fact for the jury to determine. *See State v. Joshua Michael Stewart*, No. E2017-00864-CCA-R3-CD, 2018 WL 287178, at *7 (Tenn. Dec. 20, 2017), *perm. app. denied* (Tenn. Mar. 14, 2018); *State v. Julius Weil Walton*, No. M2014-01337-CCA-R3-CD, 2015 WL 2257130, at *3 (Tenn. Crim. App. May 12, 2015), *no perm. app. filed*; *State v. Mahlon Johnson*, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at *10 (Tenn. Crim. App. Feb. 7, 2013), *perm. app. denied* (Tenn. Aug. 14, 2013), *pet. rehear dismissed* (Tenn. July 20, 2015). The State was not required to show that Defendant actually became sexually aroused or gratified. *See State v. Roy Chisenhall*, No. M2003-00956-CCA-R3-CD, 2004 WL 1217118, at *3 (Tenn. Crim. App. June 3, 2004), *no perm. app. filed*. The jury was within their authority to construe the Defendant's touching of the victim's private parts over her clothing with his mouth as being for the purpose of sexual arousal or gratification. Defendant is not entitled to relief on this basis.

Defendant also argues that the trial court failed to act as thirteenth juror despite the trial court's statement of the following from the bench: "The Judge, as 13th juror, now accepts and approves the jury verdict."

A trial judge has a "mandatory duty to serve as the thirteenth juror in every criminal case," *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995), "whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict," *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). A trial judge is not "required to provide a specific statement on the record to indicate his or her approval of the jury's verdict." *State v. Hall*, 461 S.W.3d 469, 490 (Tenn. 2015. "Whenever the trial judge simply overrules a motion for new trial, this Court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict." *State v. Thomas*, 158 S.W.3d 361, 405 (Tenn. 2005) (citing *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995)). In this case, the trial judge not only made a statement on the record that the jury verdict was approved, the trial court also denied Defendant's motion for new trial in which Defendant specifically argued that there was insufficient evidence to support his convictions. Thus, it is clear that the trial court satisfied its role as thirteenth juror. This issue is without merit, and Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE