# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 26, 2022 Session

## STATE OF TENNESSEE v. RANDY RAY RAMSEY

**Appeal from the Circuit Court for Cocke County**
**Nos. 2362, 6888, 6890[1]     Carter S. Moore,[2] Judge**

---

### No. E2021-00266-CCA-R3-CD

---

In this delayed appeal, the Defendant, Randy Ray Ramsey, appeals his conviction for second degree murder and corresponding twenty-five-year sentence. The Defendant contends that his due process rights were violated when the jury venire saw him in shackles during jury selection, including one juror who served on the jury panel. After reviewing the record and the applicable authorities, we conclude that the error was harmless and affirm the Defendant's conviction.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Bryce W. McKenzie, Sevierville, Tennessee, for the Appellant, Randy Ray Ramsey.

Herbert H. Slatery, III, Attorney General and Reporter; T. Austin Watkins, Senior Assistant Attorney General; Jimmy B. Dunn, District Attorney General; and Joann Sheldon (at trial) and Tonya D. Thornton (at trial and in post-trial pleadings), Assistant District Attorneys General, for the Appellee, State of Tennessee.

---

[1] The Defendant filed a number of post-trial pro se pleadings. Case number 2362 relates to a June 29, 2015 motion for new trial based upon newly discovered evidence and a September 21, 2015 petition for writ of error coram nobis, both of which raised an issue regarding the coroner that is not relevant to this appeal. Case number 6890 relates to a January 26, 2016 petition for writ of habeas corpus based upon jail credits, which is similarly not relevant to this appeal. Case number 6888 relates to a January 11, 2016 petition for post-conviction relief, which led to this delayed appeal.

[2] Retired Judge Ben W. Hooper, II, presided over the Defendant's trial and post-trial motions. Judge Moore took over the Defendant's case beginning with the October 17, 2017 petition for a delayed appeal.

## OPINION

## FACTUAL BACKGROUND

The Defendant was charged with first degree murder based upon the June 17, 2010 shooting death of Molly Green Howard (the victim).  See State v. Randy Ray Ramsey, No. E2013-01951-CCA-R3-CD, 2014 WL 5481327, at *1-5 (Tenn. Crim. App. Oct. 29, 2014).  Before trial, the parties agreed that the Defendant would appear in street clothing and have no physical restraints during the trial, and the trial court issued an order to that effect.

The Defendant's trial occurred on February 13-14, 2013.  On February 13, after voir dire,[3] the trial court made the following remarks:

> THE COURT: The [c]ourt does want to bring up one matter about the shackles.  I didn't notice until [the Defendant] . . . got up to leave that there was no rattling of the chains, and that may be the reason that I sat in the little ante-room outside the courtroom and actually even said something to him, as I thought all chains were being taken off of him and I did not notice that there were any chains left on him.  Now, I don't think that this is going to be a problem, but I think being an [o]fficer of the [c]ourt I guess that I should at least put that on the record and, you know, the time will come when this case is concluded that you all will have the right to talk to jurors about things, but I don't – I doubt seriously that there was a single juror [who] would have noticed that.
>
> GENERAL SHELDON:  Your Honor, if it please the [c]ourt, I had that issue in a case in Sevier County, but the difference was . . . that the jury was elevated . . . so that there was sight.  There was a difference.  In this point you got people who are sitting and their elevation is different, so I would submit that that's a difference.
>
> THE COURT: I took note of that and the only person that was kind of on this front row out here that I recall being called up was Mitch Coakley.
>
> CLERK: Well, plus Tracy Ivy was standing right there most of the time which would have blocked some of their view.

---

[3] The trial transcript begins with the trial court's discussion of the shackling issue.  From context, it appears that the jury panel had been selected and sent to the jury room before the court made its comments.

GENERAL THORNTON: And as an [o]fficer of the [c]ourt, I sat right here and watched him and I saw [trial counsel] say hello to him as he walked in and I didn't see it and I was sitting right here as well, so.

THE COURT:  Well, our witness coordinator was sitting right here in the chair and he walked by her and she did not notice it.  So anyway, it wasn't like we heard the chains a rattling and everybody looked to see what that was.  So we're back in recess.

At trial, Cocke County Sheriff's Officer Jason Oury testified that at the crime scene, he found the Defendant kneeling beside the victim and holding bloody towels; the Defendant stated, "I dropped it, it went off." Ramsey, 2014 WL 5481327, at *1.  Detective Robert Caldwell later interviewed the Defendant, who gave a written statement. Id. at *2.  The statement reflected that the victim had moved in with the Defendant about a month before her death and that on the evening of the shooting, the Defendant and the victim spent time at a bar before returning home.  According to the Defendant, the victim asked the Defendant to take his 12-gauge shotgun from the kitchen to an outbuilding.  The Defendant stated that he owned the gun in order to kill water snakes.  The Defendant claimed that when he picked up the gun, it went off; that he did not realize the hammer was cocked; and that he did not pull the trigger.  The Defendant denied that he intended to shoot the victim.  After the Defendant signed the statement, he asked to add that he habitually took the gun outside before he and the victim went to bed.  The Defendant also posed for a photograph using a baseball bat to demonstrate how he was holding the gun at the time of the shooting.

Tennessee Bureau of Investigation (TBI) Special Agent Derek Newport helped to process the crime scene, including collecting the shotgun. Ramsey, 2014 WL 5481327, at *2.  Special Agent Newport testified that when he found the gun, the "breech was closed" and lying on the floor, and the hammer was "forward."  He noted that a fired shell casing was "inside the breech, not the shotgun," and that he pulled the casing out with his fingers.

TBI toxicologist Special Agent Adam Gray testified that the victim's blood and vitreous fluid tested negative for alcohol. Ramsey, 2014 WL 5481327, at *2.  The victim's toxicology report tested positive for atropine, a drug usually administered by medical personnel, diazepam, nordiazepam, and oxycodone.  In the report, Special Agent Gray also noted that presumptive testing indicated the possibility of additional benzodiazepines as well as methylphenidate (Ritalin).  Special Agent Gray noted that all of the drugs present in the victim's system were within or below the therapeutic ranges.

TBI Special Agent Robert Royse, an expert in firearm identification, testified that the Defendant's gun was a "Lyon Arms 12[-]gauge top break shotgun" manufactured around 1900. Ramsey, 2014 WL 5481327, at *2-3.  Agent Royse noted that the gun's only

safety mechanism was a trigger guard. Special Agent Royse performed a series of tests on the gun to verify whether it would fire when struck by an object or dropped while the hammer was cocked. During the tests, the hammer remained cocked, but the gun did not fire. Special Agent Royse determined that ten pounds of pressure was required on the trigger for the hammer to "fall." He stated, though, that when the "hammer [was] lowered into the lower position and the hammer spur [was] struck with an object . . . it [would] discharge the shot shell case."

Special Agent Royse examined a bikini top that the victim was wearing at the time of the shooting and determined that the shot was fired from between two and six feet away. Ramsey, 2014 WL 5481327, at *3. On cross-examination, Special Agent Royse clarified that the shotgun would not fire when the hammer was cocked and it was "banged against something." However, it would fire when the hammer was not cocked if the gun was bumped against something from the rear with "fairly substantial" force.

Dr. Steven Cogswell performed the victim's autopsy. Ramsey, 2014 WL 5481327, at *3. The victim had a gunshot wound to her chest wall just underneath her right breast, and Dr. Cogswell noted that the edge of the wound was "associated with the lower edge of the bikini top[.]" Dr. Cogswell estimated that the muzzle of the shotgun was between three and five feet from the victim when it fired. Dr. Cogswell noted that the path of the wound through the victim's body indicated a downward trajectory. Dr. Cogswell stated that because the wound occurred in a female breast, he could examine how the shape of the wound changed with repositioning and ascertain the position of the victim's body when she was shot. Id. at *3-4. Dr. Cogswell opined that the victim was lying flat on her back when she was shot, and he further opined that the photograph showing the Defendant with the baseball bat supported his finding.

Dr. Gregory James Davis testified for the defense as an expert in pathology. Ramsey, 2014 WL 5481327, at *5. He stated that although the autopsy and corresponding report were generally "excellent," it was impossible for any pathologist to determine the position of the victim's body when she was shot. Dr. Davis agreed that the autopsy findings were consistent with the victim's lying on her back at the time of the shooting, but he noted that the findings could have been consistent with a number of scenarios.

The jury convicted the Defendant of second degree murder as a lesser-included offense. After the verdict was announced and the jurors were individually polled, the trial court held a brief bench conference in which the parties agreed that the court should ask the jury about the "little business that happened at the very beginning about the shackles." The following exchange occurred:

THE COURT: The [c]ourt's going to make inquiry as to something that happened on the morning that this trial began. [The Defendant] has been in custody for some time and I don't know for how long, but when he was brought into the courtroom, he had no handcuffs or anything on like that, but there were shackles on his ankles. Did any of you all see shackles on his ankles when he was brought into the courtroom?

(One juror raised hand)

THE COURT: You did?

. . . .

THE COURT: Anybody else?

(No response)

THE COURT: Did that play -- well, let me go one step further. Was that fact brought to the attention of anybody else?

JUROR: You mean me telling them?

THE COURT: Yes.

JUROR: No, I didn't say a word about it.

THE COURT: Did that have any bearing on your decision in this case?

JUROR: None whatsoever.

THE COURT: Okay. Okay, that's as far as I need to go.

After a sentencing hearing, the trial court ordered twenty-five years' incarceration. On May 16, 2013, the Defendant filed a motion for new trial in which he argued, in relevant part, that he was improperly shackled in front of the jury venire. At the August 22, 2013 motion for new trial hearing, the trial court made the following comments:

Now, the business about the shackles. I remember I was a little upset and concerned when that happened, but . . . I was satisfied that there was no harm created by this. I came in myself looking I guess right at him; I didn't even see it. Apparently somebody did and we addressed it. And apparently then

-5-

the courts of this state have recognized that, you know, under certain circumstances it's not a matter to be concerned with. And not that this is a ruling of mine in this case, but, you know, quite frankly, I don't see what would be wrong if you brought everybody in in shackles and stripes. You know, if they're in jail, that's where they are. What do people – where do they think they would be, you know. It seems like that we get too carried away with things and make too much out of it. Even though, as I said, it kind of had my attention[;] . . . I didn't like it at all, but I was satisfied that it was not a matter that caused you any harm or affected the jury's verdict in this case under any circumstances.

The trial court subsequently entered a September 17, 2013 written order denying the motion for new trial. In relevant part, the court found that it had questioned the jurors about the shackling, that only one juror saw the shackles and affirmed that it had no impact on his impartiality, and that no harm resulted to the Defendant. The Defendant's direct appeal of his conviction only raised as issues the sufficiency of the evidence and sentencing. Ramsey, 2014 WL 5481327, at *5-8.

On January 11, 2016, the Defendant filed a pro se post-conviction petition, which included the shackling issue as a standalone due process claim and in the context of ineffective assistance of trial and appellate counsel. The post-conviction court appointed counsel, who filed a May 20, 2016 amended post-conviction petition and subsequently withdrew on August 8, 2016. The post-conviction court appointed new counsel, and on October 17, 2017, post-conviction counsel filed a "Petition Requesting a Delayed Appeal and the Stay of All Other Matters." The Defendant argued that he was entitled to a delayed appeal because trial counsel failed to include the shackling issue in the Defendant's direct appeal in spite of instructions from the Defendant to do such.

On February 23, 2021, the post-conviction court granted a delayed appeal confined to the shackling issue. The court stated that due to difficulties in securing the Defendant transportation to court and delays caused by the COVID-19 pandemic, the parties had agreed to stipulate that counsel was deficient for failing to raise the shackling issue at trial or on direct appeal. The court noted that granting the delayed appeal resulted in a net reduction in judicial resources, but it cautioned that its finding of deficiency did not extend to any other post-conviction issue. The court further found that a reasonable probability existed that the Defendant would be granted a new trial upon appellate review of the shackling issue.

ANALYSIS

On appeal, the Petitioner contends that his due process rights were violated when a juror saw the Defendant in shackles during jury selection. The State concedes that an error occurred in this regard but argues that it was harmless.

"It is a well-settled principle of due process that every defendant in a criminal case must be afforded the 'physical indicia of innocence.'" State v. Hall, 461 S.W.3d 469, 497 (Tenn. 2015) (citing Kennedy v. Cardwell, 487 F.2d 101, 104 (6th Cir. 1973), Mobley v. State, 397 S.W.3d 70, 100 (Tenn. 2013)). Our supreme court has held that a legal presumption exists against the use of physical restraints like leg shackles at trial because they are "an affront to the very dignity and decorum of judicial proceedings" and that they should only be used as "a last resort." Id. at 498 (citing Illinois v. Allen, 397 U.S. 337, 344 (1970)); see Mobley, 397 S.W.3d at 101. However, the decision to require physical restraints is left to the sound discretion of the trial court after considering a number of factors.[4] Mobley, 397 S.W.3d at 99 (citing Willocks v. State, 546 S.W.2d 819 (Tenn. Crim. App. 1976)). In the event a defendant appears before a jury in shackles, the trial court must issue an instruction that the shackles should not influence the jury's decision. Id. When a violation of due process due to shackling occurs, we must determine whether the error was harmless beyond a reasonable doubt. State v. Thompson, 832 S.W.2d 577, 581-82 (Tenn. Crim. App. 1991).

We agree with the State that this error was harmless beyond a reasonable doubt. The Defendant wore ankle shackles during voir dire, and they were removed before trial began. The trial court, the prosecutors, and a court clerk discussed on the record that the prospective jurors had a limited view of the Defendant's feet, and the court was uncertain whether any of the seated jurors saw the shackles.[5] The court polled the jurors after the return of the verdict and determined that only one juror saw them. The juror affirmed in open court that the shackles did not impact his impartiality and that he did not tell any of the other jurors about them. The State's evidence against the Defendant was strong, and the main issue at trial was the Defendant's state of mind when he shot the victim. The jury ultimately convicted the Defendant of the lesser-included offense of second degree murder,

---

[4] Because the parties agree that the Defendant's shackling during voir dire occurred in violation of the trial court's order allowing the Defendant to appear without restraints at trial, we need not expound on the findings required to impose restraints on a defendant.

[5] We acknowledge that the parties and the trial court were placed in a difficult position—if the court had inquired with the jury venire or the jury panel about the shackles when the issue arose, it may have placed undue attention on them at the beginning of trial. Nonetheless, addressing the issue promptly would have allowed the court to excuse any potentially affected jurors or at least issue the mandated curative instruction. See Mobley, 397 S.W.3d at 99.

implicitly finding that the circumstantial evidence of premeditation was insufficient. See id. at 582 (noting that where the defendant admitted to escaping from prison, but the jury found the defendant guilty of a lesser-included offense relative to his assaulting a prison guard, "[t]hese circumstances belie[d] the existence of prejudice resulting from the leg irons [worn during trial] or from the failure to instruct relative to them."). The Defendant is not entitled to relief on this basis.

CONCLUSION

In consideration of the foregoing, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE